John Michael GAINOR, Plaintiffs,

v.

DOUGLAS COUNTY, GEORGIA,
et al., Defendants.

No. Civ.A. 1:97–CV357A JEC.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 30, 1998.

Willis Marshall, Adam Jett, Jett & Liss, Douglasville, GA, for plaintiff.

Phillip Savrin, Theodore Freeman, Freeman, Mathis & Gary, Atlanta, GA, Jennings H.B. Garbade, Office of Jennings H. Garbade, Douglasville, GA, for defendants.

## ORDER

CARNES, District Judge.

This case is presently before the Court on defendants' Motion for Summary Judgment [26]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendants' motion should be **GRANTED**.

## BACKGROUND[1]

Plaintiff Gainor is no stranger to police stops. His apparent *modus operandi* during such stops is to refuse to cooperate or to provide identification to the police when the latter, suspicious that plaintiff is engaging in criminal activity, requests such information. After two of these encounters—the Georgia arrest leading to this legal action and an arrest in Minnesota—plaintiff sued for monetary damages following his arrest by police based on what they perceived to be obstructive conduct during the encounter. *See generally Gainor v. Rogers*, 973 F.2d 1379, at 1381–82, 1390 (8th Cir.1992).[2]

The events leading to the present claim occurred on February 23, 1996, when Deputy Timothy Bearden of the Douglas County Sheriff's Department was dispatched to the residence of Ann Camp. Ms. Camp, a 51 year-old resident of Douglas County, resided on Highway 166, a two-lane road through a residential neighborhood of single-family homes. She told Deputy Bearden that she had heard "suspicious noises" a few days earlier. Ms. Camp also told Deputy Bearden that she believed her carport door may have been "jimmied", as she had experienced difficulty opening it. Ms. Camp requested increased patrols past her residence that day because she would be home alone. Deputy Bearden noted Ms. Camp's concerns in a report and returned to his patrol.

Approximately 30 minutes later, Deputy Bearden returned to Ms. Camp's residence and saw plaintiff standing in Ms. Camp's yard. According to the officer, plaintiff began walking down the road after he sighted the deputy. According to plaintiff, he was not in Ms. Camp's yard when Deputy Bearden approached, but instead was walking along a narrow path that parallels the road, within four to five feet of the shoulder of the road, in front of Ms. Camp's residence. The Court must accept plaintiff's version of these facts for purposes of this motion.

At any rate it is clear that plaintiff was in front of Ms. Camp's home when the officer approached. Deputy Bearden immediately noticed that plaintiff had a "drifter's appearance in that he looked to be unclean, had a 'scruffy' beard, and was

---

1. The following facts are drawn from the statements of material facts submitted by the parties, from their briefs in support of their motions for summary judgment and supporting documentary evidence, and from the videotape of the arrest submitted by both of the parties. Where a fact is in dispute, it is portrayed in the light most favorable to the plaintiff as the non-moving party.

2. In the latter case, plaintiff filed a § 1983 action after defendant police officer observed him carrying a twelve by six-foot wooden cross through downtown Moorhead, Minneso-

ta. Suspicious that Gainor might be acting in violation of several statutes, the officer sought to speak with the former and also requested identification. As in this case, Gainor refused to cooperate and, also as in this case, events escalated and ended with physical tussling between the officer and Gainor and with the arrest of the latter. *Id.* at 1381–82. "Virtually identical" encounters between Gainor and the police occurred in Kootenia, Idaho, in Winthrop Harbor, Illinois, and in Glendale, Wisconsin, over a thirteen month span. *Id.* at 1390.

wearing a large backpack and what appeared to be coveralls." (Def. Bearden's Aff. [26] at ¶ 6.) Suspicious of plaintiff's presence in front of Ms. Camp's home, as a result of Ms. Camp's concern about an attempted burglary, Deputy Bearden became further suspicious because plaintiff had no visible means of transportation, because Ms. Camp did not have any visitors when he was at her house only minutes before, and because, from Deputy Bearden's experience as a police officer, he knew that burglary tools (such as hammers, screwdrivers, pliers, etc.) could be carried in a backpack. (*Id.*) (Indeed, as plaintiff now concedes, he did have such tools in his backpack.) (Dep. Of Gainor at 141–43)

Deputy Bearden passed plaintiff, then made two consecutive u-turns so as to approach plaintiff from behind. As he did this, Deputy Bearden activated the emergency lights on his patrol car, which in turn activated a video camera mounted on the car's dashboard. As Deputy Bearden pulled up behind plaintiff, he instructed plaintiff, repeatedly, to remain in front of his vehicle. Plaintiff refused to comply with the officer's directive, however, for after initially pausing in front of the vehicle, plaintiff proceeded in front of the car to the driver's side window and demanded, "Am I breaking the law right now?" (Videotape [27].)

Deputy Bearden repeated his request for plaintiff to return to the front of the vehicle, but plaintiff again refused to comply with the directive of the officer and, instead, turned and walked away. Deputy Bearden again drove his car up behind plaintiff. Plaintiff, however, continued walking away from Deputy Bearden and toward Whitesburg at a brisk pace.

At this point, Bearden exited his car, with a cannister of pepper spray in his right hand, which he kept behind his back, and stated, "Hey, come here." (Videotape [27].) Plaintiff turned, walked towards Deputy Bearden, and stated, "Hey, listen to me. I'm not a dog, you talk to me like a person." (*Id.*) Deputy Bearden asked

plaintiff for identification and plaintiff interrupted, "Am I breaking the law?" (*Id.*) During this exchange, plaintiff repeatedly gestured adamantly with his finger to both the ground and to Bearden while shifting his weight forward and rising on his toes.

After plaintiff refused Deputy Bearden's repeated requests for identification, Bearden told plaintiff that plaintiff was "about to go to jail." (*Id.*) While pointing at Deputy Bearden, plaintiff responded, "You take me to jail and I'm not breaking the law and you're going to be in trouble." (*Id.*) Bearden agreed with plaintiff's assertion, and while apparently pointing back at the camera mounted in his vehicle, began to state that if plaintiff would show him some identification, but before he could finish his sentence, plaintiff again turned to walk away.

At this point, Deputy Bearden grabbed plaintiff for the first time, turned him around, and repeated that he wanted to talk to him. Plaintiff repeated his demand to know if he was breaking the law. Plaintiff and Bearden then began to argue, with both men, at times, raising their voices and pointing at the other, about whether plaintiff was required to show Bearden his identification. Plaintiff stated that he could prove to Bearden in court that he was not so required, and that he had proven this in the past.

Deputy Bearden then instructed plaintiff to keep his hands down and repeated his threat to take plaintiff to jail if he did not show the officer his identification. After plaintiff again asked what law he was breaking, Deputy Bearden stated that by not showing him identification, plaintiff was guilty of obstruction of an officer. Plaintiff then asked Deputy Bearden whether he could quote the Fourth Amendment and, if Bearden could not, offered to quote it to him. After each man assured the other that he did not feel "like playing games," the ante was raised as Deputy Bearden stated, "Right now, either show me your I.D. or your going to jail." (*Id.*) Again, plaintiff stated that he would

not give Bearden any identification unless he was breaking the law.

Deputy Bearden informed plaintiff that he was under arrest and told him to go to the police vehicle. While repeatedly trying to step around Deputy Bearden so that he could continue on his way towards Whitesburg, plaintiff asked why he was under arrest. Bearden reiterated that plaintiff was under arrest for obstruction. As plaintiff continued to try to advance and maneuver around Deputy Bearden, Bearden repeatedly told plaintiff to "take a step back," and that plaintiff was "going to jail." (*Id.*)

After initially asserting that he was not going, plaintiff stated that if Deputy Bearden took him to jail it would be false arrest and assured Bearden that the law also applied to him. Deputy Bearden, reminding plaintiff to take a step back, told plaintiff that that was fine, and firmly told plaintiff to go to the vehicle. Plaintiff responded that he wanted to speak with an attorney, and repeated his statement. Bearden, in an agitated tone, stated, "You're about to talk to one," grabbed plaintiff's arm, spun him and attempted to handcuff him. (*Id.*)

Plaintiff, however, successfully pulled his arm free. Deputy Bearden then grabbed plaintiff and knocked plaintiff's feet out from under him, successfully tripping plaintiff to the ground. Plaintiff jumped back up before Deputy Bearden was able to reach him. Plaintiff then told Deputy Bearden not to give him a hard time. Deputy Bearden told plaintiff to get down, and when he refused, Bearden again tripped plaintiff to the ground. Plaintiff again quickly got back on his feet.

Deputy Bearden then took the pepper spray out from behind his back. Plaintiff stated, "Sir, you'd better not spray me with that." (*Id.*) Deputy Bearden renewed his demand for plaintiff to get down on the ground. Plaintiff refused, and from a dis-

tance of approximately three to four feet, Bearden attempted to spray plaintiff with the pepper spray. Though on the videotape it appears that plaintiff's head was completely immersed in the spray, plaintiff stated that defendant "tried to spray my face with pepper spray but missed apparently or a gust of wind blew the spray elsewhere." (Pl.'s Aff. [32] at ¶ 15.)

In the wake of Deputy Bearden's use of the pepper spray, plaintiff wound up on the Whitesburg side of Bearden. He turned and walked quickly away. Deputy Bearden called Douglas County on his walkie-talkie and stated that he had attempted unsuccessfully to arrest plaintiff and that the use of pepper spray to restrain plaintiff had been unsuccessful. Deputy Bearden requested back-up. Deputy Bearden then quickly followed and caught up with plaintiff. (*See* Defs.' Mot. for Summ.J. [26] at 3.) Bearden again tripped plaintiff to the ground. Plaintiff stated, "Once I was on the ground, he took a telescoping baton from his belt, extended it, and held it menacingly, but did not hit me with it. Eventually, perhaps, he realized how silly he looked, and put it away." (Gainor Dep. at Ex. 9, p. 2.) Plaintiff then plead with Bearden that he could not arrest plaintiff "for nothing." (Videotape [27].) Bearden demanded that plaintiff get down and put his hands out to his sides. Plaintiff refused. Deputy Bearden continued demanding that plaintiff get down while plaintiff repeatedly told Bearden that he "had better stop it," or "you're gonna get yourself in trouble, mister." (*Id.*)

At some point, plaintiff remained on the ground with Deputy Bearden straddling him. Plaintiff wrapped his arms in front and underneath him so that he could not be handcuffed.[3] (*See* Pl.'s Aff. [32] at ¶ 16; Defs.' Statement of Material Facts [26] at ¶ 10 (citing Gainor Dep. at 153–54).)

---

**3.** At this point, plaintiff and Deputy Bearden had moved too far from the vehicle for the videotape to clearly depict what was transpiring. Moreover, a mailbox entered the line of sight and obscured the camera's view. The conversation between plaintiff and defendant continued to be captured on audio, though it too lapses at times.

Plaintiff then told Bearden that he was trying to talk to him "decent." Deputy Bearden responded, "You are under arrest. Get down." (Videotape [27].)

Plaintiff again asked what he was under arrest for and repeated that he could not be arrested if he had not broken any law. As plaintiff continued to struggle and demanded to know what he had done, Deputy Bearden told him that he was not going to fight with him. Plaintiff responded that while he also did not want to fight, he would not get down and stay down because, as plaintiff stated, "I'm not a dog and you don't tell me what to do and expect me to do it." (*Id.*)

After again stating that he was attempting to be "peaceable", plaintiff told Deputy Bearden that he "guaranteed" that Bearden would end up in court for his behavior. A passerby then entered into the conversation. Plaintiff asked the man to stay and informed him, "I'm walking down the road and he wanted to check my identification. I asked him why and he won't tell me." (*Id.*) The passerby apparently asked plaintiff why he would not show Deputy Bearden his identification if he had nothing to hide, and plaintiff responded because he did not have to if he had done nothing wrong.

Deputy Bearden then demanded that plaintiff give him his hands. Plaintiff responded by telling Deputy Bearden to let him stand and talk. Bearden rejected plaintiff's request and again demanded that plaintiff give him his hands. When plaintiff refused, Deputy Bearden stated that in that case they would stay there all day. Plaintiff responded that that was fine and, if necessary, he was ready to stay there longer than that. Bearden agreed and stated that when the other officers arrived they would take plaintiff to jail.

The third party present then attempted to talk plaintiff into giving up. He told plaintiff that Bearden would have help in a short period of time and that they would take plaintiff to jail "one way or another so you might as well calm down." (*Id.*) Plaintiff responded that he was hoping that some of the other officers would "be a little more restrained and reasonable" than Deputy Bearden. (*Id.*) The third party again told plaintiff he should try and calm down.

Rather than heed the third party's advice, plaintiff again demanded to know why he was under arrest. Deputy Bearden reiterated that plaintiff was under arrest for obstruction. Plaintiff and Bearden then renewed their argument over whether plaintiff had to show Deputy Bearden his identification. As part of this segment of plaintiff and Deputy Bearden's argument, plaintiff offered to tell "a story" demonstrating how he could "guarantee" that he knew what he was talking about and that otherwise Deputy Bearden would find out the hard way.

Deputy Bearden did not respond to plaintiff's offer and asked the third-party if he would take down the names of witnesses who had gathered. Plaintiff then asked the third party to do the same thing for him.

Shortly thereafter, Officers William Gray, J.G. Wingo, Dewey Lammie and Jeff Nalley arrived on the scene. Plaintiff asked to speak with the senior officer. Lieutenant Nalley identified himself as the senior officer. Plaintiff said that he wanted to explain what had happened. Lieutenant Nalley responded that they could talk once plaintiff allowed himself to be handcuffed. Plaintiff states that because it seemed that Nalley "was going to be reasonable" (Gainor Dep. at 157), he allowed the officers to pull his arms out from under him and handcuff him. Plaintiff was placed in a sitting position and lifted to his feet. Plaintiff then mentioned for the first time that his motorcycle had broken down on the way to work and he was in the process of walking back to Whitesburg when Deputy Bearden stopped him. Lieutenant Nalley responded that plaintiff could talk at the jail. At that point they began walking plaintiff towards one of the police vehicles.

Plaintiff had reached the vehicle and placed one foot inside of it when he heard bystanders "trying to reason with the police officers." (Gainor Dep. at 159.) Plaintiff stopped and turned in an attempt to get the bystanders names. Officer Gray ran at plaintiff, held a can of pepper spray before plaintiff's face, and told plaintiff to get in the car. Plaintiff continued to try and get the bystanders' names. Officer Gray then "screamed" at plaintiff to get in the car, but plaintiff chose to ignore him "because I [plaintiff] said if he sprays me, he's in trouble, not me." (Gainor Dep. at 160.) Gray again screamed for plaintiff to get in the car, but once again plaintiff refused. Officer Gray then sprayed plaintiff in the face with the pepper spray and plaintiff was successfully placed in the police car.[4]

Plaintiff was not able to relieve the pain in his eyes caused by the pepper spray until he arrived at the Sheriff's Department. Once there, plaintiff was allowed use of the shower to wash the spray out of his eyes. Plaintiff guesses that the spray was in his eyes for approximately 30 minutes and stated that the officers got him to a shower "as reasonably quickly as they could." (*Id.* at 163.)

Plaintiff was charged with felony obstruction. He remained in jail for six days until he could post bond of $3000. On May 22, 1996, the charge against plaintiff was dismissed.

Plaintiff filed this complaint on February 10, 1997, claiming, pursuant to 42 U.S.C. § 1983, that the rights secured to him by the Fourth and Fourteenth Amendments to the United States Constitution were violated by the actions of the officers on February 23, 1996. Plaintiff also included pendent state-law claims for assault and battery, false arrest, false imprisonment, malicious prosecution, and intentional infliction of emotional distress.[5]

## DISCUSSION

### I. *Summary Judgment Standard*

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. 2548.

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323, 106 S.Ct. 2548; *Apcoa, Inc. v. Fidelity Nat'l Bank,* 906 F.2d 610, 611 (11th Cir.1990) However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. After the movant has carried his burden, the nonmoving party is then required to "go beyond the pleadings" and present competent evidence[6] designating " 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106

---

**4.** Plaintiff states that a "ruckus" broke out between the police and one of the bystanders when plaintiff was sprayed with the pepper spray. Plaintiff stated that he was not able to see more than the police trying to throw the bystander to the ground because when he opened his eyes, "almost involuntarily," to see what was happening, the pepper spray got into them. (*Id.*)

**5.** Plaintiff did not state the grounds for the Court to take jurisdiction of his pending state-law claims. The Court presumes plaintiff intended to assert these claims pursuant to 28 U.S.C. § 1367(a).

**6.** The nonmoving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

S.Ct. 2548 (quoting FED.R.CIV.P. 56(e)). While the court is to view all evidence and factual inferences in a light most favorable to the nonmoving party, *Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir. 1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A fact is material when it is identified as such by the controlling substantive law. Id. at 248, 106 S.Ct. 2505. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249–50, 106 S.Ct. 2505. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of every element material to that party's case so as to create a genuine issue for trial.

II. *Section 1983*

▮ Section 1983 creates no substantive rights. *See Baker v. McCollan,* 443 U.S. 137, 140, 144 n. 3, 99 S.Ct. 2689, 2692, 2694 n. 3, 61 L.Ed.2d 433 (1979). Rather, it provides a vehicle through which an individual may seek redress when his or her federally protected rights have been

violated by an individual or individuals acting under color of state law. *See Livadas v. Bradshaw,* 512 U.S. 107, 132, 114 S.Ct. 2068, 2082–83, 129 L.Ed.2d 93 (1994) (citations omitted). Thus, for every § 1983 claim, plaintiff must identify a specific federal right and demonstrate that the standard of care provided for by that right has been violated by a state actor. *See Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 1870–71, 104 L.Ed.2d 443 (1989); *Daniels v. Williams,* 474 U.S. 327, 330, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

▮ In this case, plaintiff claims that defendants violated his Fourth Amendment and Fourteenth Amendment rights. Defendants argue that as plaintiff's claims stem from his arrest and its surrounding circumstances, plaintiff's Fourteenth Amendment claim must be dismissed pursuant to the Supreme Court's holding in *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 1870–71, 104 L.Ed.2d 443 (1989).

In *Graham,* the Supreme Court held:
[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.
*Id.* at 396, 109 S.Ct. at 1871 (emphasis in original). Here, plaintiff claims that he was unlawfully arrested [7] and subjected to the use of excessive force. Pursuant to the Supreme Court's holding in *Graham,* these claims fall within the confines of the Fourth Amendment. [8] Due to this holding,

---

**7.** It is axiomatic that unlawful seizure and arrest claims fall within the confines of the

Fourth Amendment. *See Graham,* 490 U.S. at 394, 109 S.Ct. 1865.

**8.** In *Graham,* the Court stated that claims

and the fact that plaintiff did not assert the merits of any Fourteenth Amendment based claim, or even mention the Fourteenth Amendment, in his response to defendants' motion for summary judgment, plaintiff's claim(s) premised on the Fourteenth Amendment are hereby dismissed. The standards promulgated by the Fourth Amendment will govern this dispute.

### III. Unlawful Seizure and Arrest Claims Against Deputy Bearden in his Individual Capacities

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. As plaintiff alleges that he was unlawfully seized pursuant to the Fourth Amendment, the Court must determine at what point plaintiff was seized, and what level of justification is required to authorize the seizure that occurred.

### (A) When was Plaintiff Seized?

■ The existence of three "levels" of police contact with citizenry, with different requirements of suspicion to sustain each contact, has been well-settled for a long time. See, e.g., United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); United States v. Berry, 636 F.2d 1075 (5th Cir.1981) (en banc ). These three levels are: (1) a consensual police-citizen encounter or conversation, in which no suspicion is required by the police, (2) an investigatory stop [9] (also known

as a Terry stop) [10], for which reasonable suspicion is required, and (3) an arrest, for which probable cause is required. Id. Accordingly, both an investigatory stop and an arrest are deemed to be seizures, within the meaning of the Fourth Amendment's prohibition against unreasonable seizures, and the propriety of both such seizures trigger analysis under the case law interpreting that Amendment.

In the present case, Deputy Bearden issued many directives to plaintiff; plaintiff acquiesced to virtually none of those directives. The first question then is when was plaintiff initially seized for purposes of Fourth Amendment analysis? In California v. Hodari D., 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), the Supreme Court addressed the issue of when a fleeing individual who resists a show of authority by officers is seized under the Fourth Amendment. In Hodari D., the police observed a group of youths huddled around a car in a high-crime area and, upon observing the approach of the officers, the young men took flight. The officers ran after the youths, one of whom dropped a rock of cocaine and was later charged with a drug offense. During the subsequent juvenile proceedings, this youth, now a defendant, argued that the officers' chase of him constituted a seizure and an illegal seizure, at that, as the officers did not have reasonable suspicion to stop the defendant. [11]

■ The Supreme Court ruled that an individual is seized only when he actually

---

involving physically abusive governmental conduct generally implicate either the Fourth or Eighth Amendment. The dividing line between these two constitutional amendments is whether plaintiff is incarcerated. See Graham, 490 U.S. at 394, 109 S.Ct. 1865.

9. An investigatory stop is frequently called a "seizure", to distinguish that kind of stop from an arrest. Yet, on occasion, the term "seizure" is also used more broadly to refer to both investigatory stops and to arrests. See, e.g., California v. Hodari D., 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). For purposes of this opinion, when the Court uses the term "seizure," it intends the broader

reference to both an investigative stop and to an arrest.

10. The "Terry stop," appellation derives from the famous Supreme Court decision, Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

11. The State of California had conceded the absence of reasonable suspicion. This Court concurs with Justice Scalia's suggestion that, notwithstanding this concession, young men who scatter in panic at the mere sighting of police, have behaved in a manner sufficient to excite reasonable suspicion. Hodari D., 111 S.Ct. at 1549 n. 1.

submits to a show of authority by an officer that would objectively lead a reasonable individual to believe he was not free to leave, or when the officer applies physical force, however slight, to the individual's body. *Hodari D.*, 111 S.Ct. at 1548; *see also Menuel v. City of Atlanta*, 25 F.3d 990, 995 (11th Cir.1994). A show of authority that does not succeed in holding the defendant is not a seizure. Thus, no seizure occurs when an officer yells, "Stop, in the name of the law" at a fleeing person who continues to flee. *Hodari D.*, 111 S.Ct. at 1548. While an unsuccessful or attempted seizure that is limited to a show of authority is not a seizure for purposes of Fourth Amendment analysis, a seizure does occur at the point that an officer applies even slight physical force to a suspect, even if that force does not succeed in stopping the individual from fleeing.[12] *Id.* at 1550.

■ Applying this standard to the facts at hand, the Court concludes that plaintiff was seized when Deputy Bearden first grabbed him by the arm, turned him around, and stated again that he wanted to talk to plaintiff. *See* discussion *supra* at 1265. Plaintiff does not argue that Deputy Bearden physically touched him before

this point, and plaintiff's affidavit makes clear that he had not previously submitted to Deputy Bearden's show of authority.[13] Accordingly, plaintiff was seized when Officer Bearden grabbed plaintiff by the arm.[14]

**(B)** *Did the Officer's Action In Touching Plaintiff Constitute An Investigatory Stop Or An Arrest?*

■ Once a seizure has occurred the protections provided by the Fourth Amendment are implicated. Not all seizures that implicate the Fourth Amendment, however, rise to the level of an arrest that must be supported by probable cause to be found reasonable. *United States v. Roper*, 702 F.2d 984, 986 (11th Cir.1983). Rather, encounters that implicate the seizure prong of the Fourth Amendment fall into two categories: (1) investigative stops, for which reasonable suspicion is required; and (2) full scale arrests, for which probable cause is necessary. *See United States v. Espinosa–Guerra*, 805 F.2d 1502, 1506 (11th Cir.1986).

■ The question then is whether Deputy Bearden's touching of plaintiff constituted an investigatory stop or an arrest and, if it were only the former, at what

12. Nevertheless, once in flight, the suspect is not under a continuing arrest for purposes of suppression. Thus, if the suspect breaks away and, in the course of his flight, discards contraband, this act cannot be said to have occurred during the course of an arrest. *Hodari D.*, 111 S.Ct. at 1550.

13. Plaintiff explained, in regard to his attempt to walk away from Deputy Bearden just prior to being grabbed, "Having no desire to stand there, argue with him, and be subjected to more of his insulting and aggressive behavior, I turned away from Defendant Bearden and tried to continue my walk toward Whitesburg." (Pl.'s Aff. [32] at ¶ 13.)

14. Prior to that time, plaintiff had refused the officer's request that he stand in front of the officer's car and instead plaintiff had walked away. Plaintiff kept walking as the officer followed in his car. Deputy Bearden then exited his car and directed plaintiff to "Come here." Plaintiff did walk over to the officer, but only for the purpose of scolding the latter

for the manner in which he was speaking at plaintiff, during which exchange, plaintiff gestured adamantly at the officer while shifting his weight toward the officer and rising on his toes. After more conversation in which plaintiff repeatedly refused the officer's request for identification, plaintiff walked away as the officer was in mid-sentence. At this point, Deputy Bearden grabbed plaintiff for the first time and told him that he wished to speak to him. *See supra* at 1264–65. At no point prior to the physical touching by Deputy Bearden did plaintiff's conduct evince an acquiescence to a show of authority that is necessary for a seizure to have occurred. Even had a seizure occurred prior to the physical touching, the Court would consider it to be no more than an investigative stop for which the facts known to the officer prior to the stop provided reasonable suspicion to justify the encounter. That is, based on the information known to him, the extent of Deputy Bearden's encounter with plaintiff was reasonable under the Fourth Amendment. *See generally* discussion *infra* at 1273–78.

later point was plaintiff arrested? In distinguishing an investigative stop from an arrest, the Court must not adhere to "rigid time limitations" or "bright line rules," but must use "common sense and ordinary human experience." *United States v. Hardy*, 855 F.2d 753, 759 (11th Cir.1988), *cert. denied*, 489 U.S. 1019, 109 S.Ct. 1137, 103 L.Ed.2d 198 (1989) (quoting *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985)). Pursuant to this common-sense approach, the totality of the circumstances determines when a seizure has become an arrest, requiring probable cause. *Courson v. McMillian*, 939 F.2d 1479, 1492 (11th Cir. 1991).

■ As a "seizure" necessarily requires that the seized individual is not free to leave, this fact alone does not distinguish an investigatory stop from an arrest. *See United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir.1995). Further, as the physical touching of the plaintiff is the event that rendered the encounter a seizure, it begs the question to assume that this same touching transformed the seizure into an arrest. Indeed, pertinent cases in this circuit suggest that there is no talismanic test for determining when a stop becomes an arrest. Thus, in *Roper*, where an officer, with a drawn gun, ordered a suspect out of his vehicle, the Eleventh Circuit construed the encounter to be an investigative stop, not an arrest. Noting that the period of the detention prior to the arrest was brief, that the officer had no intention to make an arrest when he stopped the suspect, but instead merely wished to question him, and that the stop was reasonably related in scope to the justification for its initiation, the panel concluded that the drawing of his gun by the officer did not convert the stop into an arrest. *Roper*, 702 F.2d at 986–88. *Accord Blackman*, 66 F.3d at 1576 (citations omitted).

In *Espinosa–Guerra*, in which a DEA agent at the airport asked a suspect who could not speak English to follow the agent to an office where an interpreter could be located, the panel concluded that those acts did not convert an investigative stop into an arrest even though an officer's request that a suspect follow him frequently does equal an arrest in other situations. In arriving at this conclusion, the panel applied a balancing test to weigh the Government interest involved against the intrusion on the individual. Noting the Government's interest in questioning the suspect and an inability to do so absent directing the individual to follow the agent to another location, the panel concluded that the Government had satisfied the balancing test.[15] *Espinosa–Guerra*, 805 F.2d at 1509–10.

Likewise, in *Hardy*, in which a state trooper made an investigative stop of a suspect and detained the suspect for 50 minutes while waiting for a drug detection dog, the Eleventh Circuit concluded that the duration of the stop, although it was indeed at the outer limits of an appropriate period of time for an investigative detention, did not convert the stop into an arrest. Instead, looking to the law enforcement purposes served by the detention—that is, the police were pursuing a method of investigation that was likely to confirm or dispel their suspicions quickly—the court concluded that the officers behaved diligently and reasonably. *Hardy*, 855 F.2d at 758–61.

In addition, the Eleventh Circuit has recognized, as pertinent factors indicating an investigative stop, rather than an arrest: that the officer did not take the detained person to a station or office, did not conduct a full search of the person, and did not touch the individual. *Courson*, 939 F.2d at 1492. Moreover, the fact that the police handcuff a seized individual does not automatically turn an investigative stop into an arrest. *See Blackman*, 66 F.3d at 1576 (citations omitted). In short, a reasonable attempt to restrain a seized indi-

---

15. The panel also noted that there was no physical touching of the defendant, which did occur in this case. *Espinosa–Guerra*, 805 F.2d at 1510 n. 26.

vidual does not convert a *Terry* stop into an arrest. *Tom v. Voida*, 963 F.2d 952, 958 (7th Cir.1992).

Generalizing from these cases then, one can infer that with regard to acts by an officer that can sometimes suggest an arrest and can other times connote only an investigative stop, these acts do not transform an otherwise permissible stop into an arrest (1) if they are otherwise reasonable under the circumstances and are directed toward accomplishing a limited inquiry of the suspect and (2) if the officer does not, by these acts, intend to effect an arrest on the suspect.

Applying these factors in a common-sense way to this case, the Court concludes that Deputy Bearden's initial seizure of plaintiff—when he grabbed the latter—amounted to an investigatory stop for which only a reasonable suspicion of criminal activity was required. *See* discussion *infra*. Deputy Bearden stopped plaintiff to briefly question him and to obtain his identification in order to confirm or dispel quickly a suspicion that plaintiff might be engaged or about to be engaged in criminal activity involving Ms. Camp's residence. Deputy Bearden's actions were proportional to the concerns triggered by his reasonable suspicion. Had plaintiff cooperated with Deputy Bearden, this stop would have likely been relatively brief and non-intrusive. Further, the officer demonstrated no intent to arrest plaintiff, but instead was asking only for some identification at the time the investigative stop occurred. As such, it did not constitute an arrest for which probable cause was required. Plaintiff essentially concedes this point. (*See* Pl.'s Resp. to Mot. for Summ.J. [32] at 3) ("[I]t is clear that when Defendant Bearden began his 'Terry-stop', or investigatory detention of Plaintiff he precipitated factual events which exceeded more than a brief, slight government intrusion of plaintiff's freedom.").

Plaintiff's continued seizure became an arrest when Deputy Bearden first attempted to arrest plaintiff for obstruction. Bearden informed plaintiff that he was under arrest and that he was going to jail, and instructed him to go to Bearden's vehicle. At this point it was clear that the duration of plaintiff's initial seizure, and the intended curtailment of his freedom had increased dramatically. Plaintiff's detention would no longer be brief, and the intrusion into his freedom no longer slight. As such, plaintiff's continued confinement required that Deputy Bearden have probable cause to believe plaintiff had committed or was planning to commit a crime. Defendants essentially concede this point by arguing that probable cause existed to arrest plaintiff for obstruction of an officer at this time. (*See* Defs.' Mot. for Summ.J. [26] at 10.)

(C) *Did the Officer Have The Requisite Level of Suspicion To Justify the Stop and Subsequent Arrest?*

(1) *Reasonable Suspicion for the Initial Seizure*

Having concluded that Deputy Bearden's initial seizure of plaintiff—when the officer grabbed the plaintiff—constituted an investigatory stop, the Court must now consider whether reasonable suspicion existed to suspect plaintiff of being involved in criminal activity. The Fourth Amendment requires the presence of a reasonable suspicion, based on objective facts, before an individual may be subjected to an investigative stop. *See Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979) (citations omitted). The determination of whether reasonable suspicion existed is for the Court to decide. *See Justice v. Peachtree City*, 961 F.2d 188, 193 (11th Cir.1992) (citation omitted) ("it is for the court ... ultimately to resolve whether, under the facts available to the law enforcement officer, the legal standard for reasonable suspicion was met"). This decision is purely objective; no weight may be given to the subjective intent of the police officer involved. *See United States v. Holloway*, 962 F.2d 451, 458 (5th Cir.1992). Rather, the historical facts leading up to the seizure, viewed

from the perspective of an objective reasonable police officer, are to form the basis of the court's reasonable suspicion determination. *See Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 1661–62, 134 L.Ed.2d 911 (1996); *Blackman,* 66 F.3d at 1576.

In order to determine whether reasonable suspicion existed to subject plaintiff to an investigatory stop, it is necessary to determine what constitutes a reasonable suspicion. The term "reasonable suspicion," as well as "probable cause," however, does not readily lend itself to a textbook definition. *See Ornelas,* 116 S.Ct. at 1661 ("Articulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible."). Rather, the terms reasonable suspicion and probable cause are meant to be utilized as "commonsense, nontechnical conceptions that deal with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Ornelas,* 116 S.Ct. at 1661 (quoting *Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983); *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)). As such, reasonable suspicion and probable cause are both context-dependent standards that are not entirely severable from the circumstances in which they are assessed. Therefore, they must be "developed in the concrete factual circumstances of individual cases." *Id.* (quoting *Terry v. Ohio,* 392 U.S. 1, 29, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968)).

Despite the difficulty of assigning a precise definition to the term "reasonable suspicion," there are guidelines to be applied to the facts of a particular case in determining whether a seizing officer had a reasonable suspicion that the seized individual was involved in criminal activity. To have a reasonable suspicion, a police officer must "be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting

*Terry,* 392 U.S. at 27, 88 S.Ct. at 1883). "Some minimum level of objective justification" is required. *Id.* (quoting *Immigration and Naturalization Serv. v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984)). Thus, an officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the police officer's action. *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879. If a reasonable suspicion exists, the "reasonableness of an officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques." *Sokolow,* 109 S.Ct. at 1587.

The Eleventh Circuit, construing the Supreme Court's pronouncements concerning what is required to meet the reasonable suspicion standard, stated:

"[R]easonable" suspicion is determined from the totality of the circumstances, *United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), and from the collective knowledge of the officers involved in the stop. *United States v. Williams,* 876 F.2d 1521 (11th Cir.1989). "Such a level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence ... or even the implicit requirement of probable cause that a fair probability that evidence of a crime will be found." *Tapia,* 912 F.2d at 1370. Nevertheless, the police are required to articulate some minimal, objective justification for the stop. *Id.*

*United States v. Mikell,* 102 F.3d 470 (11th Cir.1996); *see also Blackman,* 66 F.3d at 1576 (citation omitted) ("Reasonable suspicion requires more than a hunch; it requires that the totality of the circumstances create, at least, some minimal level of objective justification for the belief that the person engaged in unlawful conduct."). The reasonable suspicion standard is thus not particularly stringent as all that is required is some minimal objective justification.

In assessing whether this minimal objective justification exists, such factors as the area in which the individual was seized and the attributes of the community are valid considerations. *See Ornelas,* 116 S.Ct. at 1663; *United States v. Walker,* 924 F.2d 1, 4 (1st Cir.1991). Though the reasonable suspicion determination is objective, the police officer involved is permitted to draw inferences, or make common-sense conclusions, from the objective facts based on his or her experience in deciding whether reasonable suspicion exists. *Ornelas,* 116 S.Ct. at 1663; *Sokolow,* 109 S.Ct. at 1585–86. Further, conduct that is entirely innocent may in the proper circumstances "justify the suspicion that criminal activity was afoot." *Sokolow,* 109 S.Ct. at 1586 (quoting *Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (*per curiam* )). Lastly, the degree of reasonable suspicion required may vary depending on the degree of intrusion into the privacy of the individual seized or searched. *See Justice v. Peachtree City,* 961 F.2d 188, 193–94 (11th Cir.1992) (citation omitted).[16] *See also, e.g., United States v. Lanford,* 838 F.2d 1351, 1354 (5th Cir.1988).

In the case before the Court, defendants proffer the following evidence in support of the existence of reasonable suspicion:

(1) Approximately thirty minutes before Deputy Bearden seized plaintiff, Ms. Camp informed Bearden that she had heard suspicious noises a few days earlier around her house;

(2) Ms. Camp informed Deputy Bearden that she believed her carport door may have been "jimmied" as she had experienced difficulty opening it;

(3) Ms. Camp told Deputy Bearden that she was not expecting any visitors that day and, in view of the above, would like for him to increase the patrols of her home;

(4) plaintiff was in an area not frequented by pedestrian traffic;

(5) plaintiff had a "scruffy 'drifter's' appearance";

(6) plaintiff had no visible means of transportation;

(7) plaintiff was wearing a backpack, which, due to his experience, Deputy Bearden knew could be used to carry burglary tools;

(8) Deputy Bearden saw plaintiff in front of Camp's house on Highway 166;

(9) when Deputy Bearden first pulled up behind plaintiff and asked him to stay in front of his patrol car, plaintiff ignored him and after a hostile comment, walked to the driver's side window, and then walked away;

(10) plaintiff continued, at a brisk pace, to walk away from the officer, in

---

**16.** *Justice v. Peachtree City,* 961 F.2d 188 (11th Cir.1992) provides a good example of the minimal level of objective justification required to support a finding of reasonable suspicion. In *Justice,* the issue was whether a police officer, who viewed suspicious behavior by two juveniles in a parked car, had the necessary suspicion to justify the subsequent arrest and strip search of the juvenile. The court concluded that he did based on the following factors:
(1) the officers suspected that drinking and drug activity regularly occurred in the area in which they arrested the juveniles;
(2) Matson [the police officer] saw Justice give Simon something;
(3) Simon appeared extremely nervous;

(4) Dryden thought that females were more likely than males to conceal contraband on their persons;
(5) Simon had a friend whose mother suspected her daughter of using drugs; and
(6) Dryden suspected that Simon might have contraband on her person.
*Id.* at 194. Based on these "objective facts," the Eleventh Circuit held that, "after reviewing the totality of the circumstances in light of what the officers believed as a result of their training and experience," the officers had a reasonable suspicion that Simon was hiding contraband on her person, and thus the strip search of this 14 year-old girl did not violate the Fourth Amendment. *Id.* at 194.

violation of the latter's directive, as the latter drove behind him;

(11) when the officer approached plaintiff on foot, plaintiff continued to behave in an inappropriate and hostile manner toward the officer, while gesturing in an animated and angry fashion; and

(12) after further conversations with plaintiff in which the latter continued to argue with the officer and continued to refuse to provide any identification, the plaintiff again walked away.

*See* discussion *supra,* at 1264. (*See also* Defs.' Mot. for Summ. J. [26] at 9.) Based on these objective facts, this Court finds that a minimal objective justification existed to support a reasonable suspicion to seize plaintiff: that is, to subject him to an investigative stop.

Specifically, the officer had objective, specific, and particularized facts that reasonably supported the suspicion that plaintiff had been engaged in, or was about to be engaged in, criminal activity. The presence of such objective facts demonstrates that Deputy Bearden did not act simply to harass plaintiff. *See Terry,* 392 U.S. at 14, 88 S.Ct. at 1876. Further, the touchstone of any analysis of the Fourth Amendment is reasonableness, as the latter prohibits only unreasonable searches and seizures. Turning the inquiry around, one must ask whether Deputy Bearden would have acted reasonably had he not attempted to stop and question plaintiff. As noted, without any visible means of transportation, plaintiff was at a place for which he had no apparent reason to be present, near the home of a woman who

had called in to report a suspected attempted burglary or, at least, a concern that her door had been tampered with by someone who might be coming back. Ms. Camp's concern was so intense that she requested that the officer make frequent patrols. Further, plaintiff had a very scruffy, unkempt appearance [17] and was carrying a backpack,[18] which the officer knew from his experience could contain burglary tools. (Indeed, as noted, *supra,* the pack did contain tools, although the officer was not aware of the contents at the time of the seizure.)

Clearly, it would have been irresponsible and unreasonable, under the circumstances, for Deputy Bearden to have let plaintiff, who had disobeyed the officer's simple directive, to proceed down the road without any effort by the officer to inquire as to plaintiff's purpose for being in the neighborhood. Further, at each step of an escalating encounter, the officer behaved in a reasonable manner. After the officer first approached the plaintiff, the latter's hostile and uncooperative conduct logically heightened Deputy Bearden's suspicion. Admittedly, an individual is not required to converse with an officer. Nevertheless, while the silence of a suspect would not constitute reasonable suspicion, the excessive hostility displayed by plaintiff and his repeated efforts to walk away from the officer in contravention of the latter's directives,[19] reasonably increased the officer's concerns about the plaintiff's presence near Ms. Camp's house. Again, one must ask what a reasonable officer should have done at this juncture? When an officer asks to speak to a suspicious indi-

---

17. An individual's unkempt, or "scruffy" appearance, has been held to support a finding of reasonable suspicion. *See United States v. Walker,* 924 F.2d 1, 3 (1st Cir.1991) (court notes "scruffy appearance"); *United States v. Lanford,* 838 F.2d 1351, 1354 (5th Cir.1988) (court notes "unkempt appearance").

18. As previously noted, conduct that is completely lawful in and of itself can give rise to a reasonable suspicion of criminal activity. *See Sokolow,* 109 S.Ct. at 1586.

19. A suspect's attempt to walk away has been held to be a valid factor supporting a finding of reasonable suspicion. *See Lee v. Immigration and Naturalization Serv.,* 590 F.2d 497, 502 (3rd Cir.1979). *See also United States v. Holloway,* 962 F.2d 451, 461 (5th Cir.1992) (citing *United States v. Amuny,* 767 F.2d 1113, 1124 (5th Cir.1985)).

vidual under these circumstances and the latter repeatedly walks away, after having spoken to the officer in an inappropriate and hostile fashion,[20] it would seem that the officer has an obligation to continue to try to speak to the subject to gauge out the level of risk threatened, requiring the officer to allow such a subject to walk away, when the latter's disobedience has only heightened the officer's consensus, does not seem reasonable or wise. Certainly, an investigative stop must be limited in duration and nature and an officer cannot endlessly interrogate the subject of such a stop, but the officer's efforts here to complete his inquiry of a subject who was repeatedly disobeying the officer's directive were reasonable under the circumstances and suspicions known to the officer.

Plaintiff's argument to the contrary is unpersuasive. Plaintiff argues that a reasonable suspicion did not exist because Deputy Bearden "never stated what crime or criminal activity plaintiff might have been guilty of committing; no particularized description even closely matching that of the Plaintiff was even broadcast; there is no evidence presented showing that Ann Camp gave any indication that a "crime" had been committed, and Defendant Bearden stated that he did not observe any criminal activity on the part of Plaintiff before the Plaintiff began to defy Bearden's orders." (Pl.'s Resp. to Mot. for Summ. J. [32] at 5.) As to plaintiff's last contention, reasonable suspicion may be created by conduct which is in and of itself lawful. *See Sokolow*, 109 S.Ct. at 1586. Second, though a description of a suspect matching a seized individual would be a significant fact upon which to find the existence of a reasonable suspicion, it is not a prerequisite to such a finding. Finally, plaintiff's argument that Ms. Camp did not state that a crime had been committed and Bearden did not state what crime he be-

lieved plaintiff had committed is also unpersuasive. An investigative stop must be justified by a reasonable suspicion of criminal activity, not a particular crime. For example, the Eleventh Circuit has held that one driver's attempted payoff of the other driver involved in a crash was a legitimate ground for finding the existence of a reasonable suspicion of *illegal activity, and not of a particular crime.* It was not clear what the individual was attempting to hide, but just that he was attempting to hide something. *See Lindsey v. Storey,* 936 F.2d 554, 558 (11th Cir.1991); *see also Tom v. Voida,* 1991 WL 343377, *4 (S.D.Ind.1991), *aff'd,* 963 F.2d 952 (7th Cir. 1992) ("the law only requires that the officer have specific and articulable facts giving rise to reasonable suspicion of criminal activity, not a specific crime"). Moreover, the fact that Bearden did not specify what crime *he* believed plaintiff had committed or was planning to commit is irrelevant, as the reasonable suspicion inquiry is objective in nature. *See Rankin v. Evans,* 133 F.3d 1425, 1433 (11th Cir.1998) (citation omitted); *United States v. Roy,* 869 F.2d 1427, 1432 (11th Cir.), *cert. denied,* 493 U.S. 818, 110 S.Ct. 72, 107 L.Ed.2d 38 (1989). Objectively, the Court finds that the facts created a reasonable suspicion to stop and investigate whether plaintiff was involved in illegal activities on Camp's property. Thus, plaintiff's claims stemming from Deputy Bearden's initial seizure of him are dismissed.

#### (2) *Probable Cause for the Subsequent Arrest*

In addition to claiming that Deputy Bearden seized him without possessing the necessary reasonable suspicion, plaintiff also claims that the officer's subsequent arrest of plaintiff was made without probable cause and hence violated the Fourth Amendment. This issue presents a much

---

**20.** The Court does not mean to suggest that citizens must be polite to police officers. The First Amendment presumably allows some discourtesy. The Court focuses on the inappropriateness and hostility of plaintiff's con-

duct, in relation to all the other factors, to demonstrate that plaintiff's conduct reasonably increased the officer's suspicions of the plaintiff.

closer question than did the inquiry regarding the existence of reasonable suspicion for the investigatory stop. The Court is inclined toward the view that there was probable cause to arrest plaintiff, under Georgia law. At any rate, given the uncertainty on this question, one must conclude that the legal authority on this question was not so clearly established that the illegality of the arrest would have been obvious to a reasonable officer. *See* discussion *infra.* Accordingly, defendant Bearden would be entitled to qualified immunity even were the arrest deemed by a reviewing court to be unconstitutional. To avoid repetition, the Court will discuss the legality of the arrest in its discussion of the qualified immunity issue *infra* at 45–59.

### (D) Qualified Immunity

### (1) *Qualified Immunity for the Initial Seizure*

In their motion for summary judgment, defendant Bearden also argues that even if the Court were to find that a reasonable suspicion did not exist to seize plaintiff at the time of his initial seizure, Deputy Bearden would still be shielded from liability due to the doctrine of qualified immunity. Even though the Court has concluded that Deputy Bearden's initial seizure of plaintiff was constitutional, alternatively, it also concludes that, even if the seizure were unconstitutional, the officer would be immune from liability.

■ Qualified immunity protects government officials from civil liability if their conduct violates no "clearly established statutory or constitutional rights of which a reasonable person would have known." *Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146, 1149 (11th Cir.1994) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); *Jordan v. Doe,* 38 F.3d 1559, 1565 (11th Cir.1994). As the Supreme Court has explained, "permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). Because of this important interest, "the protection of qualified immunity extends to all but the plainly incompetent or those who knowingly violate the law." *Jordan,* 38 F.3d at 1565 (citing *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)). Optimally, the Court is to make the decision of whether a defendant enjoys qualified immunity before trial, as due to the policy reasons behind qualified immunity, it is meant to "be an immunity from trial, not just from liability." *Post v. Fort Lauderdale,* 7 F.3d 1552, 1556 (11th Cir. 1993), *modified on other grounds,* 14 F.3d 583 (11th Cir.1994).

■ A two-part analysis is used to address a qualified immunity defense. First, the defendant must prove that he was "acting within the scope of his discretionary authority" when the allegedly wrongful acts occurred. *Hudgins v. City of Ashburn,* 890 F.2d 396, 404 (11th Cir.1989) (citing *Rich v. Dollar,* 841 F.2d 1558, 1563–64 (11th Cir.1988)). To satisfy this standard, defendant must show "objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Hutton v. Strickland,* 919 F.2d 1531, 1537 (11th Cir.1990) (quoting *Rich,* 841 F.2d at 1564). Clearly it is within a police officer's discretion to decide whether to subject an individual to an investigative stop. Further, in his affidavit, Deputy Bearden swore that he was on duty and on his routine patrol when he decided to stop plaintiff. (*See* Def. Bearden's Aff. [26] at ¶ 3.) Thus, the first prong of this two-part analysis is satisfied.

■ Once the defendant makes this showing, "the burden is on the plaintiff to show that, when the defendant acted, the law established the contours of a right so clearly that a reasonable official would have understood his acts were unlawful."

*Post,* 7 F.3d at 1557. In order for the law to be so clearly established, it "must have earlier been developed in such a concrete and factually definite context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing violates federal law.'" *Jenkins by Hall v. Talladega City Bd. of Educ.,* 115 F.3d 821, 823 (11th Cir.1997) (*en banc*), *cert. denied, Jenkins by Hall v. Herring,* —— U.S. ——, 118 S.Ct. 412, 139 L.Ed.2d 315 (1997) (quoting *Lassiter,* 28 F.3d at 1149).

Plaintiff may not meet this burden by "referring to general rules and to the violation of abstract 'rights'." *Lassiter,* 28 F.3d at 1150 (citation omitted). Rather, plaintiff must demonstrate that, *in factual terms,* that is, in a materially similar situation, a bright-line rule has been drawn, and that defendants crossed that line. *Id.* at 1150 (emphasis in original) ("For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances.*").

 As a determination of reasonable suspicion is made on a case by case basis, and is not subject to a neat categorical rule, a defendant will often be able to legitimately claim qualified immunity as to a claim that he or she lacked a reasonable suspicion to seize an individual in contravention of the Fourth Amendment. *Cf. Thompson v. City of Clio,* 765 F.Supp. 1066, 1078 (M.D.Ala.1991) (citing *Dartland v. Metropolitan Dade County,* 866 F.2d 1321, 1323 (11th Cir.1989)). All that is required to grant defendant qualified immunity is that "the facts known to him at the time of the seizure at least arguably created a reasonable suspicion." *Storey,* 936 F.2d at 559.

Plaintiff did not engage in any factual analysis in his response to defendants' motion for summary judgment. The Eleventh Circuit has instructed that such a failure may not be excused. *See Lassiter,* 28 F.3d at 1150. Rather, while interjecting legal principles more relevant to an analysis of municipal liability under § 1983,[21] plaintiff simply makes generalized statements such as, "The rights of individuals to be free from illegal detentions, beatings and excessive use of force under color of law as free citizens has been well established since *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), if not since the *Terry v. Ohio* case decided in 1968." (*See* Pl.'s Resp. to Mot. for Summ. J. [32] at 16.) Due to plaintiff's failure to point to a single instance in which, on the facts presented or even on analogous facts, a reasonable suspicion was held not to exist, he has not carried his burden. The Court concludes that it would not be *obvious* to *all* reasonable governmental actors that what Deputy Bearden did violated the Constitution. *See Jenkins by Hall,* 115 F.3d at 823. Accordingly, even had the Court not held that the initial seizure of plaintiff was constitutional, Deputy Bearden would be entitled to qualified immunity for his actions in seizing plaintiff.

(2) *Qualified Immunity for Subsequent Arrest*

Defendant argues that even if the Court concluded that probable cause to arrest plaintiff for obstruction did not exist, Deputy Bearden would be immune from suit due to the defense of qualified immunity. As discussed in the preceding section, supra at 1278–80, Deputy Bearden would be

---

21. For instance, in the section of his brief arguing that defendants are not entitled to qualified immunity, plaintiff states, "To defeat the defense of qualified immunity requires that a Plaintiff prove affirmative causal connection between official acts and/or policies; but it does not necessarily require that an official personally participated in the Constitutional deprivation." (Pl.'s Resp. to Mot. for Summ.J. [32] at 17.) Simply stated, while this statement may have relevance to the issue of municipal liability, it has no relevance to the issue of qualified immunity.

entitled to qualified immunity for plaintiff's claim that he was arrested without probable cause unless there was not even arguable probable cause to arrest plaintiff. *See Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir.1997). Again, plaintiff has the burden of demonstrating that his arrest violated a right clearly established in a factually similar context. *See Lassiter*, 28 F.3d at 1150.

Like reasonable suspicion, probable cause is not a term susceptible to a clear delineation. *See Ornelas*, 116 S.Ct. at 1661. Rather, "probable cause" is a "nontechnical concept[ ] that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983); *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)); *see also Marx v. Gumbinner*, 905 F.2d 1503, 1506 (11th Cir.1990) (probable cause to be "judged not with clinical detachment but with a common sense view to the realities of normal life").

The Eleventh Circuit has instructed that in determining whether probable cause existed to arrest, the Court must consider the facts available to the arresting officer at the moment of arrest. *See United States v. Allison*, 953 F.2d 1346, 1349 (11th Cir.1992). "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." *Diaz–Lizaraza*, 981 F.2d at 1222 (citing *United States v. Gonzalez*, 969 F.2d 999, 1002 (11th Cir. 1992)). Probable cause does not require overwhelmingly convincing evidence, but only "reasonably trustworthy information." *Marx*, 905 F.2d at 1506 (citing *Beck v.*

*State of Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225–26, 13 L.Ed.2d 142 (1964)). The determination of whether probable cause exists is also determined on a purely objective basis. *See Rankin v. Evans*, 133 F.3d 1425, 1433 (11th Cir.1998) (citation omitted). Thus, like reasonable suspicion, whether a particular officer believed or did not believe that probable cause existed is irrelevant. *Id.*

Defendants contend that during the course of carrying out his investigative stop, Deputy Bearden acquired probable cause to arrest plaintiff for obstruction of an officer pursuant to O.C.G.A. § 16–10–24.[22] (*See* Defs.' Mot. for Summ.J. [26] at 10 (citing *Herren v. State*, 201 Ga.App. 509, 411 S.E.2d 552 (1991); *Bailey v. State*, 190 Ga.App. 683, 379 S.E.2d 816 (1989)).) Plaintiff argues that he was arrested solely for refusing to proffer his identification and that, pursuant to O.C.G.A. § 16–10–24, this act does not provide probable cause to arrest an individual for obstruction of an officer. (*See* Pl.'s Resp. to Mot. for Summ.J. [32] at 5 (citing *Wagner v. State*, 206 Ga.App. 180, 183, 424 S.E.2d 861 (1992)).) The Court concludes that there were two potential grounds for arresting defendant: (1) his refusal on two occasions to comply with the officer's directive that he stop and (2) his refusal to provide identification upon the request of the officer.

As the second ground is more complicated than the first, the Court will address it initially. Further, as plaintiff argues that the arrest violated both Georgia law and federal constitutional law, the Court will also have to analyze how those two bodies of law impact this determination. The question then is whether plaintiff's failure to provide identification under the circumstances in this case constituted a ground for his arrest.

---

**22.** O.C.G.A. § 16–10–24 provides:

(a) Except as otherwise provided in subsection (b) of this Code section, a person who knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties is guilty of a misdemeanor.

(b) Whoever knowingly and willfully resists, obstructs, or opposes any law enforcement officer ... in the lawful discharge of his official duties by offering or doing violence to the person of such officer or legally authorized person is guilty of a felony and shall, upon conviction thereof, be guilty of a felony.

## (a) *Georgia law*

The Georgia courts have ruled that a refusal to provide identification can constitute violation of O.C.G.A. § 16–10–24, which prohibits a person from willfully obstructing or hindering a law enforcement officer in the lawful discharge of the latter's official duties. In *Bailey v. State*, 190 Ga.App. 683, 379 S.E.2d 816 (1989), the Georgia Court of Appeals held that failure to produce identification to an officer, who is in the lawful discharge of his duties, constitutes obstruction of an officer pursuant to O.C.G.A. § 16–10–24. There, a non-uniformed officer had observed the defendant driving recklessly. Following the latter to his home, the officer announced herself as an officer and tried to speak to the defendant and to examine the latter's identification. The defendant refused to provide any identification. The Georgia Court of Appeals held that defendant's refusal to identify himself was not merely discourteous, but also actually hindered and obstructed the officer in her investigation. *Bailey*, 190 Ga.App. at 684, 379 S.E.2d 816.

Likewise, in *Hudson v. State*, 135 Ga. App. 739, 218 S.E.2d 905 (1975), the Court of Appeals upheld a conviction for obstruction where an individual who police believed might be the person wanted on a bench warrant refused to provide the police with identification. The Court of Appeals noted that the obstruction statute had been purposely drafted broadly to cover actions that might not be otherwise unlawful, but which obstructed or hindered law enforcement officers in carrying out their duties. *Hudson*, 135 Ga.App. at 742, 218 S.E.2d 905.

Plaintiff relies on *Wagner v. State*, 206 Ga.App. 180, 424 S.E.2d 861 (1992), in support of his argument that his failure to provide identification did not constitute a ground for arrest. There, an officer approached the defendant for seemingly no reason and ordered the latter into a police car, after he had refused to provide identification. The defendant became unruly and was later arrested for disorderly conduct. The panel assumed that the first "arrest" occurred when the police officer ordered defendant into the police car and also inferred that this "arrest" had to have been based on the defendant's refusal to give his name. It held that there was insufficient probable cause to arrest for obstruction based on the mere refusal by a citizen to identify himself to the police and, accordingly, the officer could not legally arrest the defendant for the latter's resistance to the prior illegal "arrest."[23] Addressing the two earlier cases that had

---

**23.** This case illustrates a very disturbing feature of Georgia law with regard to a suspect's right to resist arrest. If the defendant's initial seizure for refusing to provide identification were illegal, one would assume that his ability to file a civil suit or to have suppressed the contraband discovered as a result of that arrest would constitute the appropriate remedies for the illegal action of the police. One would not assume, however, that the defendant would have the right to engage in fisticuffs with the officer merely because he disagreed with the basis of the arrest. Yet, Georgia legal authority says just that. *See also Brooks v. State*, 206 Ga.App. 485, 425 S.E.2d 911 (1992).

Thus, in Georgia, if an arrest is illegal, an arrestee has "the right to resist with all force necessary for that purpose." *Wagner*, 206 Ga.App. at 182, 424 S.E.2d 861. In essence, then, Georgia case law tells an arrestee that as long as he can convince a court, some-

where down the road, that the officer lacked reasonable suspicion or probable cause, the suspect can feel free to resist, with physical force, the officer's efforts to restrain him. Of course, as few suspects will know exactly what quantum of facts an officer possesses, this invitation does not necessarily encourage informed resistance but more likely encourages a knee-jerk disobedience to the directives of a police officer by the more violent members of our society. Given the dangerous and uncivil times in which we live, this Court respectfully submits that such a policy incentive is very unwise.

Indeed, as the Eleventh Circuit has stated, "[T]he common-law right to resist arrest that is not based upon probable cause, suited though it may have been to a past era, has no significant role to play in our society where ready access to the courts is available to redress such police misconduct." *United States v. Bailey*, 691 F.2d 1009, 1018 (11th Cir.

**1282**

authorized an arrest for obstruction based on the suspect's failure to provide identification, the panel distinguished those cases, noting that in both cases the police had been investigating a matter for which the facts known to the officer supported the stop and/or the request. In *Wagner*, however, the officer seemingly had no reason for stopping Mr. Wagner and hence was not lawfully discharging his duties when he requested the defendant's identification. *See Wagner*, 206 Ga.App. at 182, 424 S.E.2d 861. Attempting to draw some broader generalization from these cases, it appears that, under Georgia case law dealing with the offense of obstruction, the standard for determining whether an officer was lawfully discharging his duties such that a refusal to provide identification would constitute obstruction is whether a reasonable suspicion existed to stop the individual charged with obstruction. *See Holt v. State*, 227 Ga.App. 46, 48, 487 S.E.2d 629 (1997); *Brooks v. State*, 206 Ga.App. 485, 489, 425 S.E.2d 911 (1992).

■ This Court has already held that a reasonable suspicion, or at least an arguable reasonable suspicion, existed to justify defendant Bearden's seizure of plaintiff. Thus, as Deputy Bearden was in the arguably lawful exercise of his duties, arguable probable cause existed to arrest plaintiff for obstruction of an officer when he refused to produce his identification. As

plaintiff has not demonstrated that a reasonable officer would necessarily have known that an arrest was illegal under these circumstances—indeed this Court does not know whether Georgia courts would hold this arrest to be unlawful—the officer enjoys qualified immunity as to whether he had probable cause under Georgia law to arrest defendant for failure to provide identification.

Moreover, as the probable cause determination requires the Court to look at all of the objective evidence available to the arresting officer at the time that the arrest was made, the Court also notes that plaintiff twice walked away from Deputy Bearden after being told to stop. *See supra* at 1265.[24] As noted a reasonable suspicion to stop plaintiff existed before Deputy Bearden exited his car. *See supra* at n. 14. Deputy Bearden was therefore in the lawful exercise of his duties when he subsequently told plaintiff to stay so that he could speak with him. At this time, although plaintiff was not yet seized,[25] it was objectively clear that Deputy Bearden intended for plaintiff to stay. Plaintiff walked away. This act also supplied probable cause to arrest plaintiff for obstruction. *See Sprinkles v. State*, 227 Ga.App. 112, 113, 488 S.E.2d 492 (1997) (attempt to leave after lawful command to stay constitutes obstruction of an officer); *Tankersley v. State*, 155 Ga.App. 917, 919–20, 273 S.E.2d 862 (1980).[26] Thus, even ignoring

1982), *cert. denied*, 461 U.S. 933, 103 S.Ct. 2098, 77 L.Ed.2d 306 (1983). *See also Ford v. Wilson*, 90 F.3d 245, 247 (7th Cir.1996) (plaintiff's argument that he could not be arrested for obstruction if there were no basis for stopping him in the first place is "obviously wrong"; there are legal remedies for being stopped by the police without any basis but physical resistance is not one of them and it is not constitutionally protected).

**24.** The Court is referring to the second time that plaintiff attempted to walk away from Deputy Bearden. The first time occurred when Deputy Bearden was still in his vehicle.

**25.** Plaintiff was seized when Deputy Bearden grabbed his arm immediately after plaintiff attempted to walk away. *See supra* at 1269–70.

**26.** *Brooks v. State*, 206 Ga.App. 485, 489, 425 S.E.2d 911 (1992), does not compel a different answer. In *Brooks*, the defendant had been badgering the police as they searched an acquaintance for drugs, after which the defendant walked away and the police told him to stop. The defendant ignored the officer's request and continued to walk away, after which one officer blocked his path. The defendant then attempted to push through the officer and was restrained by several officers. The Georgia Court of Appeals reversed defendant's conviction for obstructing an officer, holding that the officer had seized the defendant at the time he blocked his path and that the officer lacked probable cause or reasonable suspicion to do so. *Brooks*, 206 Ga.App. at 488, 425 S.E.2d 911. Although the Court repeats its previous observations about the wisdom of a policy that allows an individual

Gainor's refusal to provide identification, there was an alternative ground that supplied arguable probable cause.

Finally, before leaving this section of the discussion, the Court acknowledges its awareness of *Gainor v. Rogers*, 973 F.2d 1379 (8th Cir.1992), in which the Eight Circuit denied the defendant officer's motion for summary judgment as to his qualified immunity defense in a § 1983 action based on false arrest and excessive force claims brought by the same John Gainor who is the plaintiff in this case. The Court concludes that the Eight Circuit case is factually distinguishable from this case. In the latter case, in which the plaintiff had been arrested for obstruction of an officer, a majority of the panel concluded that, assuming the plaintiff's version of the facts, a reasonable officer could not have concluded that there was reasonable suspicion to stop plaintiff. Accordingly, as there was no reasonable suspicion to stop plaintiff, the officer's subsequent arrest for plaintiff's refusal to provide identification was clearly not legal, according to this panel.[27] Unlike, the panel in that case, this Court has concluded that there was arguable, and even actual, reasonable suspicion to support the officer's subsequent actions. In addition to the facts known to Deputy Bearden prior to stopping plaintiff, the plaintiff disobeyed defendant's direction to stop, a fact that was not present in the Eighth Circuit case.

Moreover, leaving the factual distinctions aside, the Court finds the dissent in this Eighth Circuit case more persuasive and truer to the doctrine of qualified immunity as articulated in this circuit than is the majority opinion. As noted by the dissent, "the majority opinion pays only lip service to the defense of qualified immunity in this close case, the very kind of case for which the defense was intended."[28] *Gainor v. Rogers*, 973 F.2d at 1388. Moreover, while not dispositive as a legal matter, this Court finds persuasive, on a practical level, the dissent's observation that it is difficult to conclude that the defendant officer could be characterized as "plainly incompetent" or a knowing violator of the law, which are the only types of officials who are not covered by the qualified immunity defense, when officers in four states, over a thirteen month period of time, had discerned probable cause to arrest plaintiff Gainor for conduct identical to that in the case before the panel. *Id.* at 1390.

In summary, as probable cause, or arguable probable cause, existed to arrest plaintiff for obstruction under Georgia law, Deputy Bearden's arrest of plaintiff did not violate plaintiff's Fourth Amendment rights.

(b) *Application of Federal Constitutional Law to this Arrest*

Plaintiff also argues that even if the arrest were legal under Georgia law, it was unconstitutional under federal law which, according to plaintiff, proscribes an arrest

---

to ignore a police officer's command to stop and further to physically push that officer, *see* note 23 *supra*, it notes that *Brooks* is distinguishable from this case. In *Brooks*, the police lacked reasonable suspicion at the time that they directed Brooks to stop; here, the court has concluded that Deputy Bearden possessed such suspicion when he asked the defendant to stop.

27. Citing *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), the majority noted that it was an open question whether an individual may be arrested for refusing to identify himself in the context of a lawful investigatory stop. *Gainor v. Rogers*, 973 F.2d at 1386 n. 10.

28. The dissent argues that clearly the least intrusive method for the officer to use in investigating possible unlawful soliciting was to request some identification. If the officer was reasonable in making the stop and asking for identification, the lawfulness of the arrest would then turn on the narrow issue left open by the Supreme Court in *Brown v. Texas*, *supra*: that is, whether an individual may be "punished" for refusing to identify himself in the context of a lawful investigatory stop. As that issue remains unsettled, the dissent reasons, plaintiff Gainor failed to allege a violation of clearly established law that would convert a common law tort of false arrest to a violation of a constitutional right. *Gainor v. Rogers*, 973 F.2d at 1389.

based on a suspect's refusal to provide identification.

 As noted in the previous discussion, it is clear that the Supreme Court has left open the question whether it is unlawful to sanction a person who is the proper subject of an investigatory stop as a result of the latter's refusal to provide identification. *See Kolender v. Lawson,* 461 U.S. 352, 361 n. 10, 103 S.Ct. 1855, 1860 n. 10, 75 L.Ed.2d 903 (1983); *Brown v. Texas,* 443 U.S. 47, 53 n. 3, 99 S.Ct. 2637, 2641 n. 3, 61 L.Ed.2d 357 (1979). Likewise, the Seventh, Eighth and Tenth Circuits have noted that the question remains open. *Albright v. Rodriguez,* 51 F.3d 1531, 1537 (10th Cir.1995); *Gainor v. Rogers,* 973 F.2d 1379, 1386–87 (8th Cir.1992); *Tom v. Voida,* 963 F.2d 952, 959 & n. 8 (7th Cir. 1992).[29]

Plaintiff does identify one case that supports his argument that, in the Eleventh Circuit, a refusal to provide identification cannot be the basis for an arrest. In *United States v. Brown,* 731 F.2d 1491 (11th Cir.), *vacated in part on other grounds on reh'g,* 743 F.2d 1505 (11th Cir.1984), DEA agent Paul Markonni was questioning a suspicious passenger and ultimately arrested this passenger for falsely identifying himself to a law enforcement officer; the search that occurred after this arrest revealed the presence of cocaine strapped to the leg of the passenger, who challenged the search after his indictment on drug charges. The Eleventh Circuit held that the evidence should have been suppressed because the facts known to the agent were insufficient to establish probable cause to believe that the defendant had provided false identification in violation of Georgia law.[30] *Brown,* 731 F.2d at 1494. In dictum, the panel suggested that a person who is the subject of a *Terry* stop has the right to refuse to provide identification.[31] *Id.* Certainly, this single statement by the Court provides support for plaintiff's argument. As the issue is whether the law was clearly established, however, the Court is reluctant to conclude that one sentence of dictum, in a opinion that did not address the question in issue head on, provides the requisite notice of illegality to a law enforcement officer. Indeed, the Eleventh Circuit has recently affirmed that the law cannot be established by dicta. *Santamorena v. Georgia Military College,* 147 F.3d 1337, 1342 n. 13 (11th Cir. 1998). Additionally, in surveying the case law across the country on this issue, the Tenth Circuit notes that, other than *Martinelli,* "no other federal district or circuit court opinions [ ] have addressed this issue." 51 F.3d at 1538. Obviously, if the Tenth Circuit, writing nine years after *Brown* and after a presumably diligent search, was unaware that plaintiff's legal argument is the law in the Eleventh Circuit, it seems unfair to attribute this knowledge to a deputy in Douglas County who likely does not enjoy the same legal skills as do Tenth Circuit judges. As *Brown* did not deal with Georgia's obstruction statute, it arguably did not draw a bright line in circumstances so factually similar to those at hand that all reasonable officers in Deputy Bearden's place would have believed the actions he took were unconstitutional and, thus, its existence does not defeat the defense of qualified immunity. *See Lassiter,* 28 F.3d at 1150.

 Even if *Brown* were deemed to provide notice that, in the Eleventh Circuit, a refusal to produce identification can never be the ground for an arrest, as noted *supra,* there is a second ground for plaintiff's arrest under the Georgia obstruction statute: specifically, plaintiff re-

---

29. The Ninth Circuit appears to have determined that the refusal to provide identification cannot be the basis of an arrest. *Martinelli v. City of Beaumont,* 820 F.2d 1491 (9th Cir.1987).

30. O.C.G.A § 16–10–25.

31. "The defendants' refusal to furnish identification—which they were entitled to do is indeed this was a *Terry* stop, as the government must contend—may have created suspicion that they had actually used false names, but falls far short of probable cause." *Brown,* 731 F.2d at 1494.

peatedly refused to follow the lawful direction of the officer that plaintiff stop. Instead of remaining still in front of the officer's car as directed, the plaintiff insisted on moving right next to the officer where plaintiff in fact upbraided the officer. Obviously, moving toward a police officer, particularly in a combative manner, when the officer has told a subject to stay in a certain spot, is obstructive conduct that could cause an escalation of force in the encounter with potentially negative results for the officer and the subject. In addition, plaintiff repeatedly walked away from the officer after the latter had told the plaintiff to stop. Again, the Court construes this to be obstructive conduct. No federal case law in the Eleventh Circuit of which this Court is aware holds that it is unconstitutional to arrest an individual for the above described obstructive conduct. To the contrary, a subject under such circumstances is expected to comply with the officer's direction. See *Bailey* and *Ford v. Wilson, supra* at 1282 n. 24.

Thus, the Court concludes that defendant Bearden enjoys qualified immunity as no clearly established state or federal authority forbade his conduct under these circumstances.

## IV. Unlawful Seizure and Arrest Claims Against Officers Nalley, Wingo, Gray and Lammie

Defendants argue that plaintiff's Fourth Amendment unlawful seizure and arrest claims against Officers Nalley, Wingo, Gray and Lammie must be dismissed because these officers did not arrive on the scene until after plaintiff was arrested. As such, defendants argue that these officers cannot be held liable for an arrest that they took no part in and which they had no input into. (*See* Defs.' Mot. for Summ.J. [26] at 15) (citing *Morley's Auto Body, Inc. v. Hunter*, 70 F.3d 1209, 1218 (11th Cir. 1995).)

Plaintiff contends that these officers are not entitled to summary judgment because they failed to intervene to prevent the violation of plaintiff's constitutional rights. In making this argument, plaintiff relies on *Byrd v. Clark*, 783 F.2d 1002 (11th Cir. 1986). (*See* Pl.'s Resp. to Mot. for Summ.J. [32] at 9.)

First, due to the fact that the Court has held that Deputy Bearden's actions in initially seizing plaintiff and subsequently arresting him did not violate plaintiff's Fourth Amendment rights, the officers did not fail to intervene in the face of a constitutional violation, and plaintiff's unlawful arrest claims against these individuals fail. Second, ignoring for the moment the fact that no constitutional violation occurred, in *Byrd v. Clark*, 783 F.2d 1002 (11th Cir. 1986), the Eleventh Circuit explained, "If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation, such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983." *Byrd*, 783 F.2d at 1007 (citations omitted). Thus, plaintiff's own case authority demonstrates the hole in his argument. These officers were not present when plaintiff was arrested. Because they were not there, these officers cannot now be held liable for failing to intervene in plaintiff's arrest. Thus, plaintiff's unlawful seizure and arrest claims against Officers Nalley, Wingo, Gray and Lammie are dismissed.

## V. Excessive Force Claims

Plaintiff also claims that his Fourth Amendment rights were violated due to defendants use of excessive force in seizing and arresting him. Taking all of the facts plaintiff submits with appropriate documentary evidence as true, the question of whether plaintiff was subjected to the use of excessive force in violation of the Fourth Amendment is a question of law for the Court to decide. *See O'Neal v. DeKalb County, Ga.*, 850 F.2d 653, 657 n. 6 (11th Cir.1988).

Plaintiff failed to specifically allege how he was subjected to the use of excessive force. Thus, in the absence of guidance from plaintiff, the Court will consider Deputy Bearden's actions in tripping plaintiff to the ground, drawing his baton, and using pepper spray on plaintiff, and Deputy

Gray's use of pepper spray on plaintiff after he was handcuffed.

■■■ Under the Fourth Amendment, the standard to be applied in determining whether governmental agents utilized excessive force is whether the force used was objectively reasonable under the circumstances. *See Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). This inquiry is to be made "from the perspective of a reasonable officer on the scene, rather than with the $^{20}/_{20}$ vision of hindsight." *Id.* at 396, 109 S.Ct. 1865 (citation omitted). As the excessive force standard is objective, the officer's motivation or intent in using force is irrelevant. *See Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir.1996).

Like reasonable suspicion and probable cause, the determination of whether plaintiff was subjected to the use of excessive force is a fact-sensitive inquiry. *Id.* Such factors as "the severity of the crime, whether the suspect poses an immediate threat, and whether the suspect is resisting or fleeing" are often crucial to the question of whether the force used was objectively reasonable. *Post v. Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir.1993), *modified on other grounds*, 14 F.3d 583 (11th Cir.1994). Further, because the Fourth Amendment's excessive force standard "establishes no bright line, qualified immunity applies unless application of the standard would inevitably lead every reasonable officer in [defendant's] position to conclude the force was unlawful." *Id.*

A. *Did Deputy Bearden Use Excessive Force*

■■■ Plaintiff alleges that Deputy Bearden utilized excessive force in seizing and subsequently arresting him. Because the Court finds that each use of force by Deputy Bearden was reasonable under the circumstances, or at least that no jury could find on the facts presented that every reasonable officer in Deputy Bearden's position would have believed that the force used was unlawful, plaintiff's Fourth Amendment claims that Deputy Bearden subjected him to the use of excessive force are dismissed.

As to Deputy Bearden's act of "trip[ing]" plaintiff to the ground, (*See* Pl.'s Aff. at ¶ 16.) Deputy Bearden took this action only after he informed plaintiff that he was under arrest, after plaintiff refused to go · to the police vehicle, and after plaintiff pulled free when Deputy Bearden attempted to handcuff him. Under these circumstances, Deputy Bearden's attempt to trip plaintiff to the ground so that he could handcuff plaintiff was reasonable. From the perspective of an officer on the scene, to continue to struggle with plaintiff while standing would have presented a greater danger to Deputy Bearden's safety. Further, Deputy Bearden's continued efforts to trip plaintiff to the ground were caused by plaintiff's efforts and ability to quickly regain his footing. Thus, pursuant to the factors enumerated above, Deputy Bearden was justified in using this level of force in an effort to restrain a subject who was resisting arrest. Alternatively, a jury could not find that every reasonable officer in Deputy Bearden's position would believe that tripping plaintiff to the ground under these circumstances was unreasonable.[32]

---

**32.** As noted *supra* at 1278, in order to overcome the defense of qualified immunity, plaintiff is required to demonstrate that the right allegedly violated had been clearly established in a similar factual context. In attempting to rebut defendants' qualified immunity defense, plaintiff failed to engage in any factual analysis. Further, two of the cases he cites, *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and *Hamm v. DeKalb County*, 774 F.2d 1567 (11th Cir. 1985), *cert. denied*, 475 U.S. 1096, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986), were brought by incarcerated individuals awaiting trial and challenged the allegedly unconstitutional conditions of their confinement. Further, in *Hamm*, plaintiffs challenged the conditions of their confinement under the Eighth and Fourteenth Amendments. *See Hamm*, 774 F.2d at 1569. Thus, these cases provide no support for plaintiff's claim that defendants' are not entitled to qualified immunity.

The second use of "force" was Deputy Bearden's attempt to subdue plaintiff through the use of pepper spray. Before *attempting*[33] to spray plaintiff with his pepper spray, Deputy Bearden had twice unsuccessfully attempted to subdue plaintiff by tripping him and had twice told plaintiff to "get down". Plaintiff refused to get down and quickly got up both times that Deputy Bearden tripped him. The use of pepper spray has previously been found to be reasonable because "as a means of imposing force, pepper spray is generally of limited intrusiveness," and it is "designed to disable a suspect without causing permanent physical injury." *Griffin v. City of Clanton, Ala.*, 932 F.Supp. 1359, 1369 (M.D.Ala.1996); *see also Singleton v. City of Newburgh*, 1 F.Supp.2d 306 (S.D.N.Y.1998) (finding use of pepper spray reasonable and listing other cases finding use of pepper spray reasonable). Deputy Bearden's alternative was to continue physically struggling with plaintiff. This alternative would have presented a greater degree of danger both to Deputy Bearden and to plaintiff. To force an armed officer to physically confront an individual resisting arrest seems to the Court manifestly more unreasonable than allowing the use of pepper spray, as any number of unforseen contingencies (such as the officer losing his firearm) could· occur with a continuing physical altercation. Under these circumstances, the Court finds Deputy Bearden's attempt to subdue plaintiff through the use of pepper spray to be reasonable. Alternatively, Deputy Bearden is at least entitled to qualified immunity for his use of pepper spray as, under the circumstances, one cannot say that every reasonable officer in Deputy Bearden's position would have known that his use of pepper spray violated the Constitution.

Third, Deputy Bearden drew his baton. Deputy Bearden took this action after finally successfully tripping plaintiff to the ground. (*See* Pl.'s Aff. at ¶ 16.) By this point in time, Deputy Bearden had repeatedly and unsuccessfully attempted to subdue plaintiff both by tripping him and by attempting to spray him with pepper spray. Clearly the situation Deputy Bearden faced was not orderly. The Eleventh Circuit has held that an officer's act of drawing a weapon when faced with the need to restore order is reasonable. *See Courson v. McMillian*, 939 F.2d 1479, 1494–95 (11th Cir.1991) (citations omitted). As such, Deputy Bearden's act of drawing his weapon was reasonable under the circumstances.

Thus, each of plaintiff's claims of excessive force against Bearden are dismissed, as the force Deputy Bearden used was reasonable under the circumstances. Alternatively, as to each use of force, that is, plaintiff has not demonstrated that Deputy Bearden had violated a right that had been clearly established in a similar factual context. *See supra* at n. 26.

### B. *Did Deputy Gray Use Excessive Force?*

 Plaintiff also complains that Deputy Gray utilized excessive force when he sprayed plaintiff in the face with pepper spray. Deputy Gray took this action when plaintiff stopped as he was getting into a police vehicle and turned in an attempt to get the names of bystanders who had gathered at the scene. As plaintiff ceased entering the vehicle and turned, Officer Gray ran at plaintiff, held a can of pepper spray before plaintiff's face, and told plaintiff to get in the car. Plaintiff continued to try and get the bystanders' names. Officer Gray then "screamed" at plaintiff to get in the car, but plaintiff chose to ignore him "because I [plaintiff] said if he·sprays me, he's in trouble, not me." (Gainor Dep. at 160.) Gray again screamed for plaintiff to get in the car, but once again plaintiff refused. Officer Gray then sprayed plaintiff in the face with the pepper spray and

---

**33.** Plaintiff stated that Deputy Bearden missed him when Deputy Bearden attempted to spray plaintiff with the pepper spray. (*See* Pl.'s Aff. at ¶ 15.)

plaintiff was successfully placed in the police car.

Under these circumstances, Deputy Gray is entitled to summary judgment concerning his use of force. Deputy Bearden, as well as the other Douglas County police officers who were now on the scene, had spent a considerable amount of time in trying to subdue plaintiff. Just when it appeared that plaintiff was about to finally enter the police vehicle, he decided to take a course of action that would have required the use of force to physically put him in the vehicle. Deputy Gray stopped him, however, by holding a can of pepper spray in his face. Deputy Gray adamantly told him to get in the vehicle three times. Each time, plaintiff refused. Only then did Gray spray him.

While perhaps it might have been better to physically push plaintiff into the vehicle, as plaintiff was now handcuffed, it is clear that not every reasonable officer would have necessarily believed that the force Deputy Gray used was unreasonable under the circumstances. Further, to hold Deputy Gray's action unreasonable for the sole reason that he could have done something *more reasonable*, and not because the action he took was itself unreasonable, would be to engage in the sort of "20/20 hindsight" against which the Supreme Court warned. *See Graham*, 490 U.S. at 396, 109 S.Ct. 1865.

The District Court for the Middle District of Alabama also came to this same conclusion when faced with facts comparable to those at issue here. In *Griffin v. City of Clanton*, 932 F.Supp. 1359 (M.D.Ala.1996) (Albritton, J.), a police officer stopped a vehicle because it was making loud noises, emitting smoke from its exhaust system, and exceeding the speed limit. *Griffin*, 932 F.Supp. at 1363. The vehicle contained two occupants, Sidney Griffin and Jeff Cleckley, who were cousins. When the driver, Griffin, identified himself, the officer believed that he smelled alcohol. *Id.* Griffin subsequently failed two field sobriety tests. *Id.* At this

point, a second officer arrived on the scene. *Id.*

Griffin claimed that after he failed the sobriety tests, without being told that he was under arrest, one of the officers slammed him into the police car. Griffin states that out of fear for his safety he then fled to his aunt's house, which was nearby. The other occupant of the vehicle, Jeff Cleckley, was given permission to leave at this time. *Id.* The officers called in for backup, waited for a backup officer to arrive, and then continued to pursue Griffin, who was on the back porch of his aunt's house banging on the door and yelling to be let in. *Id.* As Griffin's aunt opened the door so he could come in, the two officers burst in behind him. *Id.*

The officers shoved the aunt aside, ignored her questions and demands that they leave her house, and pursued Griffin into the living room where they cornered him. *Griffin*, 932 F.Supp. at 1363. Griffin alleged that one of the officers then hit him with his night stick, and that as he struggled with the officers he was pushed over the furniture and onto the floor. *Id.* Two more officers then entered the house. Further, Cleckley, hearing his mother screaming, came into the house. One of the officers grabbed Cleckley, held him against a wall, and refused to let him go to his mother. *Id.* Once Cleckley told an officer that he was the woman's son, the officer ordered him out of the house and told him that he was under arrest. *Id.* at 1364.

At this point, Griffin had been handcuffed, but was still struggling with two officers on top of him. One of the officers who had gone out of the house came back in and, not realizing that plaintiff was handcuffed, decided to use his pepper spray. He waited for a moment so as not to hit another officer, then pulled Griffin's head back and sprayed him directly in the face. Due to the noxious odors this produced, everyone, except Griffin then left the house. Griffin was left to lie handcuffed on the floor until a state trooper

who had arrived went into the house and removed him. *Id.* at 1364.

Based on these facts, the court held that the officers were entitled to qualified immunity both for hitting Griffin with a night stick, and for spraying him with the pepper spray. *Id.* at 1369. The court held that the use of the pepper spray was not unreasonable because the officer knew that Griffin had fled once already, believed that he was intoxicated, and confronted a scene that was chaotic. *Id.*

Similarly, in this case plaintiff had resisted being arrested for approximately 15 minutes, had attempted to leave and the scene had grown chaotic. While, unlike the officer in *Griffin,* Deputy Gray knew plaintiff was handcuffed, this fact does not change the analysis significantly, as the officer in *Griffin* knew that two officers were on top of Griffin. Further, in this case Deputy Gray gave plaintiff ample opportunity to get into the vehicle without being sprayed with the pepper spray. Deputy Gray told plaintiff three times that if he did not get into the vehicle he would be sprayed. Finally, rather than physically forcing plaintiff into the vehicle, Deputy Gray sprayed plaintiff. Under these circumstances, Deputy Gray's conduct was clearly not so unreasonable that every reasonable officer in Deputy Gray's position would have known that the force Deputy Gray used was unreasonable. *See, e.g., Singleton v. City of Newburgh,* 1 F.Supp.2d 306, 314–15 (S.D.N.Y.1998). Thus, plaintiff's Fourth Amendment excessive force claim against Deputy Gray is also dismissed.[34]

### C. *Excessive Force Claim Against Officers Wingo, Nalley, and Lammie*

■ Plaintiff also argued that Officers Nalley, Wingo and Lammie should be held personally liable for what he alleged was the use of excessive force by Officers Bearden and Gray. As was the case with plaintiff's claims against these individuals for his alleged unconstitutional seizure and arrest, plaintiff claims that these officers should be held liable because they failed to intervene to prevent a constitutional violation. The Court also dismisses these claims. First, a duty to intervene only arises if a constitutional violation occurs in another officer's presence. *See Byrd v. Clark,* 783 F.2d 1002, 1007 (11th Cir.1986). As to the force used by Officer Bearden, no constitutional violation occurred. Thus, because there was no constitutional violation, there was no duty to intervene. Similarly, as Deputy Gray is entitled to qualified immunity because every reasonable officer would not have found the amount of force he used unlawful, the back-up officers are entitled to qualified immunity because not every reasonable officer on the scene would have believed that a constitutional violation had occurred and would thus have *known* it was wrong not to intervene. *See Lassiter,* 28 F.3d at 1149 (government officer only loses qualified immunity if officer's act is obviously wrong).

■ Second, plaintiff must proffer evidence that the officer in question had a reasonable opportunity to intervene. *See Riley v. Newton,* 94 F.3d 632, 635 (11th Cir.1996), *cert. denied,* 519 U.S. 1114, 117 S.Ct. 955, 136 L.Ed.2d 842 (1997). Deputy

---

**34.** Plaintiff also engaged in no factual analysis relevant to the qualified immunity standard in regards to the action taken by Deputy Gray. In *Lassiter v. Alabama A & M University,* 28 F.3d 1146 (11th Cir.1994), the Eleventh Circuit stated, "The most common error we encounter, as a reviewing court, occurs on this point: courts must no permit plaintiffs to discharge their burden by referring to general rules and to the violation of abstract 'rights.'" *Lassiter,* 28 F.3d at 1150 (citations and footnotes omitted). Rather, "[f]or qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances.*" *Id.* (emphasis in original). Pursuant to the Eleventh Circuit's mandate, as plaintiff did not attempt to discharge his burden, his claim for excessive force against Deputy Gray must be dismissed for this reason as well.

Bearden's alleged unlawful use of force occurred before the backup officers arrived. Thus, they did not have had a reasonable opportunity to prevent Deputy Bearden's use of force. Similarly, plaintiff did not direct the Court to any evidence indicating that any of the officers had a reasonable opportunity to stop Deputy Gray. While it is clear that these officers were on the scene, plaintiff presented no evidence that they were close enough to Deputy Gray and plaintiff to intervene. *See Riley*, 94 F.3d at 635 ("The three blows were struck in such rapid succession that Conners had no realistic opportunity to attempt to prevent them. *This was not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator.*") (quoting *O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2nd Cir.1988) (emphasis added)). Thus, plaintiff's excessive force claims against these individuals are dismissed.

## VI. *Claims Against Sheriff Waldrop in his Individual Capacity*

Plaintiff seeks to hold Douglas County Sheriff Tommy Waldrop liable in his individual capacity for plaintiff's allegedly unlawful seizure and arrest, and for the officers alleged use of excessive force, under the theory of supervisory liability. (*See* Pl.'s Resp. to Mot. for Summ.J. [32] at 11.) Because the Court has held that neither the initial seizure of plaintiff, plaintiff's subsequent arrest, nor Bearden's use of force violated the Constitution, plaintiff's claims against Sheriff Waldrop in his individual capacity premised upon these actions are dismissed. Further, even if the Court had held that plaintiff's Fourth Amendment rights were violated by these actions, as well as Deputy Gray's use of allegedly "excessive" force, plaintiff's attempt to impose individual liability on Sheriff Waldrop under a supervisory theory of liability fails.

If the individual upon whom a plaintiff is seeking to hold liable under a theory of supervisory liability was not present at the time that the alleged constitutional viola-tion occurred, the standard to impose liability upon him is "extremely rigorous". *Braddy v. Florida Dept. of Labor and Employment Security*, 133 F.3d 797, 802 (11th Cir.1998). The Eleventh Circuit stated:

> Supervisory liability [under § 1983] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervisory official and the alleged constitutional deprivation. The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he [she] fails to do so. The deprivations that constitute widespread abuse sufficient to notify the supervisory official must be obvious, flagrant, rampant, and of such continuous duration, rather than isolated occurrences.

*Id.* at 801 (citing *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir.1990), *cert. denied*, 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991) (citations omitted)). Sheriff Waldrop was not present at the time of the alleged constitutional deprivations. Thus, to reach the question of whether Sheriff Waldrop failed to take any required corrective actions, plaintiff must demonstrate a history of rampant, flagrant, obvious, and continuous constitutional violations.

Plaintiff set forth *no* evidence of past investigative stops made without reasonable suspicion or past arrests made without probable cause. Further, plaintiff alluded to only two past instances in which Douglas County police officers allegedly used excessive force in violation of the Constitution. (*See* Pl.'s Resp. to Mot. for Summ.J. [32] at 13.) The allegation of two instances of past abuses does not amount to abuses so "obvious, flagrant, rampant, and of such continuous duration" as to impose liability upon an officer's supervisor in light of the rigorous standard that must be satisfied. *See Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir.1990), *cert.*

*denied,* 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991) (four instances of abuse in four years does not put supervisor on notice) (quoting *Clark v. Evans,* 840 F.2d 876 (11th Cir.1988)). As such, plaintiff's claims based on the theory of supervisory liability against Sheriff Waldrop are dismissed.[35]

## VII. *Municipal Liability*

 Plaintiff has also brought suit against each defendant in his official capacity, as well as against Douglas County. A suit against a party in his or her official capacity is the same as suit against the governmental entity of which the officer is an agent. *Owens v. Fulton County,* 877 F.2d 947, 951 n. 5 (11th Cir.1989). The Court has held that plaintiff's Fourth Amendment rights were not violated by his seizure and arrest or by Deputy Bearden's use of force. Plaintiff's claims stemming from these action against the individual defendants in their official capacities and against Douglas County are therefore dismissed as municipal liability cannot lie where there has been no underlying constitutional violation inflicted by the municipality's agents. *See City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986); *Vineyard v. County of Murray,* 990 F.2d 1207, 1211 (11th Cir.), *cert. denied,* 510 U.S. 1024, 114 S.Ct. 636, 126 L.Ed.2d 594 (1993).

Further, even if defendants had failed to demonstrate that plaintiff's rights were not violated by his seizure, subsequent arrest, and Deputy Bearden's use of force, plain-

tiff's claims stemming from these actions against Douglas County would still be dismissed. As this is the case, plaintiff's claim against Douglas County for Deputy Gray's alleged use of excessive force must also be dismissed.[36] Plaintiff seemingly attempts to impose liability upon Douglas County under three different theories. These three theories are failure to train, failure to supervise, and a ratification theory of liability.

 A local government is liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). State law dictates who are municipal policymakers. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 482–83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (Brennan, J.). To attribute liability to a municipality under § 1983, the plaintiff must demonstrate that the municipality had an official policy that was "the moving force of the constitutional violation." *Vineyard,* 990 F.2d at 1211 (quoting *Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981)).

### A. *Ratification Theory*

Plaintiff claims that Sheriff Waldrop is a policymaker with regards to state law,[37] that he ratified the officers violation of plaintiff's Fourth Amendment rights, and

**35.** The case plaintiff cited to support his theory of supervisory liability held that officials *on the scene* who fail to exercise their command function can be held liable for a resulting constitutional violations. *See Burton v. Waller,* 502 F.2d 1261, 1284 (5th Cir.1974). This case does not further plaintiff's cause, however, as Deputy Waldrop was not on the scene when plaintiff was seized, subsequently arrested, and subjected to the use of force by the defendant officers.

**36.** For the remainder of this discussion on municipal liability, the Court will operate under the assumption that plaintiff was able to prove that his Fourth Amendment rights were

violated by his seizure, subsequent arrest, and by being subjected to the use of excessive force.

**37.** Plaintiff cites O.C.G.A. § 15–16–10 to support his claim that Sheriff Waldrop is authorized to make final policy with regards to the subjects at issue in this litigation. This statutory section grants sheriffs *no* authority to make policy. *See* O.C.G.A. § 15–16–10. Because defendants do not argue that Sheriff Waldrop does not have the authority to set policy concerning the issues involved in this case, the Court will not dismiss plaintiff's claims against Douglas County on this ground, however.

that Douglas County should therefore be liable for this ratification.

■ In *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), a plurality of the Supreme Court held that municipal policy may be created by a policymaker's ratification of a subordinate's actions. *See Praprotnik*, 485 U.S. at 127, 108 S.Ct. 915. The Court further explained, however, that the creation of policy by a subordinate does not occur simply because a supervisor goes along with the discretionary decisions of his or her subordinate. *Id.* at 130, 108 S.Ct. 915. Rather, in order for a subordinate's actions to be deemed municipal policy, one of two things must occur: either the subordinate must cast his discretionary decision in the form of a policy statement that is then expressly approved of by the supervising policymaker, or the subordinate must have repeatedly made the same decision such that it had become a "custom or usage" of which his or her supervisor must have known and approved. *Id.See also Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 998 n. 29 (11th Cir.1990).

■ Plaintiff has presented no evidence in this case that any subordinate officer made a policy-like statement that was then approved by Sheriff Waldrop.[38] Rather, plaintiff states only that Sheriff Waldrop "ratified and approved the behavior of all his deputies in the incident." (*See* Pl.'s Resp. to Mot. for Summ.J. [32] at 13.) Plaintiff also states that Sheriff Waldrop "ratifies and approves a policy of punishing pre-trial detainees with pepper spray or 'passing licks'." (*See* Pl.'s Resp. to Mot. for Summ.J. [32] at 10 (citing

Waldrop Dep. at 24).) This characterization of Sheriff Waldrop's testimony, however, is extremely inaccurate. Sheriff Waldrop actually stated, in regard to the action taken by Deputy Gray, "I'd much rather want them to be sprayed with pepper spray than licks passed." (*See* Waldrop Dep. at 24.) This does not amount to a general statement of policy.[39] Rather, this constitutes a supervisor's decision to go along with a discretionary act of his subordinate. The Supreme Court explained that acquiescence cannot be held to create a municipal policy. *See Praprotnik*, 485 U.S. at 130.

Plaintiff also failed to present evidence that the Douglas County officers repeatedly made decisions similar to Officer Bearden's decision to seize and arrest plaintiff, or that Douglas County officers repeatedly made the decision to use excessive force. Rather, plaintiff did not direct the Court to a single instance in which a Douglas County officer seized an individual without a reasonable suspicion or arrested an individual without probable cause, and only to two instances in which Douglas County officers allegedly used excessive force in making an arrest. (*See* Pl.'s Resp. to Mot. for Summ.J. [32] at 13.) Thus, these actions had not become customs or usages of Douglas County. *See Praprotnik*, 485 U.S. at 130, 108 S.Ct. 915 (subordinate must repeatedly make same decision for it to become custom or usage). Therefore, plaintiff has presented no evidence that a custom or usage existed for Sheriff Waldrop to ratify.

**38.** The closest example of such a statement the Court found is Lieutenant Nalley's statement that he believed Deputy Bearden's use of pepper spray was consistent with Douglas County policy. (*See* Nalley Dep. at 79.) Just prior to making this statement, however, Lieutenant Nalley indicated that he was trained to use pepper spray only when necessary to subdue somebody, or when it would not make a situation worse. (*Id.* at 78.) Thus, Nalley was not making a policy-like statement which could then later be approved by Sheriff Waldrop. Rather, he was giving

his opinion concerning Deputy Bearden's use of pepper spray in this instance. Lieutenant Nalley's opinion concerning the constitutionality of Deputy Bearden's use of force, however, is immaterial.

**39.** This statement would also fail under the ratification theory of liability because it refers to what happened to plaintiff, and not to a policy that was previously established, and thus could not have been the moving force behind plaintiff's alleged constitutional deprivations. *See infra* at 1293.

■ Rather, plaintiff's evidence consists of the fact that Sheriff Waldrop stated that he approved of the actions taken towards plaintiff. (*See* Def.'s Resp. to Mot. for Summ.J. [32] at 10–11.) Without evidence of *previous* approval for such actions, however, Sheriff Waldrop's approval of the actions taken during this single encounter is not enough to impose liability upon Douglas County. *See Praprotnik*, 485 U.S. at 130, 108 S.Ct. 915.[40] That is, the Supreme Court has clearly held that a municipality can only be held liable if its policy was the moving force behind a constitutional violation. *See Polk*, 454 U.S. at 326, 102 S.Ct. 445. A *post hoc* approval of an action already taken could not possibly be the motivating force for causing the action to be taken.[41] Thus, in order to impose liability under a ratification based theory, it is necessary to show prior ratification of the policy giving rise to the action alleged to have violated the plaintiff's federal rights, such that the ratification of that policy could be said to be the moving force behind the alleged constitutional violation. *See Looney v. City of Wilmington, Del.*, 723 F.Supp. 1025, 1037 (D.Del.1989) (denying ratification theory because "a government's later ratification of an employee's actions could not in any sense be viewed as the cause of those actions"). Thus, plaintiff's ratification theory of liability is denied.

### B. *Failure to Train and Supervise*

■ Plaintiff also alleges that Douglas County should be held liable in this case under the theory that it had a policy of failing to train and supervise its police officers.[42] (*See* Pl.'s Resp. to Mot. for

Summ.J. [32] at 15.) In order to establish municipal liability for failure to train, plaintiff must prove: (1) that the County in fact inadequately trained its employees in the lawful execution of their duties, and (2) that this failure to train was actually a County policy. *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1555 (11th Cir.1989) (citing *Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

With regard to the second element, the Supreme Court defined the standard for determining whether a governmental entity's failure to train its agents could constitute an impermissible custom resulting in liability. The Court stated:

> [O]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983. As Justice Brennan's opinion in *Pembaur v. Cincinnati*, put it: '[M]unicipal liability under § 1983 attaches where ... a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers.

*Canton v. Harris*, 489 U.S. at 389, 109 S.Ct. 1197 (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 483–84, 106 S.Ct. 1292, 1300–01, 89 L.Ed.2d 452 (1986) (plurality opinion)).

■ In analyzing this deliberate indifference standard, the Eleventh Circuit noted, "Before it may be said that a municipality has made a deliberate choice among alternative courses of action, its policymakers must have had 'actual or constructive

---

**40.** Moreover, Sheriff Waldrop's decision to approve of his officers' actions in this one instance cannot be held to create a municipal policy. *See supra* at 1292.

**41.** There are also strong public policy reasons for this holding. If a municipality could be held liable merely for approving of an officer's actions on the occasion under attack, each time a § 1983 suit were filed, the municipality would be forced to choose between risking taxpayers' dollars and undermining a

good employee who may have done nothing wrong. The law does not force such a choice upon municipalities.

**42.** As the Eleventh Circuit Court of Appeals has observed, when interrelated claims of failure to train and failure to supervise and provide corrective training are raised, the court should focus on the element common to both claims: the alleged failure to train. *See Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1555 (11th Cir.1989).

notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens.'" *Young v. City of Augusta*, 59 F.3d 1160, 1172 (11th Cir.1995) (quoting *Canton*, 489 U.S. at 396, 109 S.Ct. 1197 (O'Connor, J., concurring in part and dissenting in part)). Thus, knowledge or notice of the need for training is required before liability may be imposed on a municipality for a failure to train. *See Canton*, 489 U.S. at 390 n. 10, 109 S.Ct. 1197. The Eleventh Circuit explained that the need for certain training may be obvious where governmental actors "face clear constitutional duties in recurrent situations" or "where a pattern of constitutional violations exists such that the municipality knows or should know that corrective measures are needed." *Id.* (citations omitted). Thus, unless the need for training is obvious, "[r]andom acts or isolated incidents are usually insufficient to establish a custom or policy." *Lawrence v. Metro Dade County*, 872 F.Supp. 957, 963 (S.D.Fla. 1994) (citing *Depew v. City of St. Marys, Ga.*, 787 F.2d 1496, 1499 (11th Cir.1986)).

Here, plaintiff did not argue that Douglas County had either actual or constructive knowledge of the need to train or retrain its police officers concerning the appropriate standards for the seizure of an individual the use of force in making the arrest. Because stopping, questioning, and at times arresting individuals through the use of force is such a fundamental component of police work, and one in which police "face clear constitutional duties in recurrent situations," the Court will assume that Douglas County had actual knowledge of the need to generally train its officers concerning these matters; however, there is no evidence that there was a specific need as to the type of encounter made here. *Young*, 59 F.3d at 1172.

 Assuming that a municipality has knowledge of the need to train its officers concerning the subject in question, a plaintiff seeking to prevail on a claim of failure

to train must establish that the municipality in fact failed to train its officers in regard to the subject, and must demonstrate an affirmative link between the failure to train and the resulting constitutional deprivation. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). This affirmative causal link between a failure to train and a resulting constitutional violation requires strict evidentiary proof. The Fourth Circuit explained:

> This requires first that a specific deficiency rather than general laxness or ineffectiveness in training be shown. It then requires that the deficiency or deficiencies be such, given the manifest exigencies of police work, as to make occurrence of the specific violation a reasonable probability rather than a mere possibility. In common parlance, the specific deficiency or deficiencies must be such as to make the specific violation "almost bound to happen, sooner or later," rather than merely "likely to happen in the long run."

*Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir.1987), *cert. denied*, 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988) (citing *Patzner v. Burkett*, 779 F.2d 1363, 1367 (8th Cir.1985)); *see also Floyd v. Waiters*, 831 F.Supp. 867, 873 (M.D.Ga.1993), *aff'd*, 133 F.3d 786 (11th Cir.1998) (quoting *Spell*, 824 F.2d at 1390).

 Here, plaintiff did not point to any specific failure or submit any evidence concerning a specific failure on the part of Douglas County to train its officers concerning when it is lawful to seize an individual and to subsequently make an arrest. Plaintiff also did not point to a specific failure of Douglas County's training regarding the use of force in effecting an arrest. Rather, plaintiff submitted statements made by Douglas County officers that plaintiff's arrest was in compliance with Douglas County policy and statements concerning the officers knowledge of Fourth Amendment law.[43]

---

**43.** Even in doing this, plaintiff misstated the officers' testimony. (*Compare, e.g.*, Pl.'s Resp. to Mot. for Summ.J. [32] at 15(b), *with* Wingo Dep. at 54 lines 19–24.)

Such statements are not relevant to the issue of whether Douglas County failed to adequately train its police officers. The Supreme Court has instructed that the question is whether a reasonable and prudent police officer would have committed the constitutional violation *because of* the deficient training program, that is, but for the deficient training program the constitutional violation would not have occurred. *See Canton*, 489 U.S. at 391, 109 S.Ct. 1197. Without evidence concerning the training actually provided and how it is allegedly deficient, there is simply no way for the Court to make this determination. As such a showing is an affirmative part of plaintiff's case, it is an issue on which he bears the burden of proof. His failure to submit any evidence as to a specific deficiency in Douglas County's training of its officers that actually caused plaintiff's alleged constitutional deprivations is inexcusable.

Rather than submitting evidence pertaining to a specific defect in Douglas County's training, plaintiff asks the Court to infer from his arrest alone, and the force the officers used in carrying it out, that Douglas County maintains a policy of inadequate training. This is simply too slender a reed on which to infer the existence of a county policy. The Supreme Court has held that an unconstitutional policy cannot be inferred from a single alleged constitutional violation. *See Tuttle*, 471 U.S. at 821, 823, 105 S.Ct. 2427. This is essentially what plaintiff asks of the Court. Moreover, the Court has concluded that the level of force used was appropriate.

As plaintiff would bear the burden of proof on this issue at trial, it was his duty to provide support for his claim that Douglas County failed to train its officers, and to direct the Court to evidence demonstrating a specific defect in the training Douglas County provides. *See Riley v. Newton*, 94 F.3d 632, 638–39 (11th Cir.

1996), *cert. denied*, 519 U.S. 1114, 117 S.Ct. 955, 136 L.Ed.2d 842 (1997). He did not. (*See* Pl.'s Resp. to Mot. for Summ.J. [32] at 10–15.) Without such evidence, even if the Court had found that plaintiff's Fourth Amendment rights had been violated, plaintiff's claim that Douglas County should be held liable for the failure to train its officers would be dismissed. *See Riley*, 94 F.3d at 638–39.

VIII. *Plaintiffs' Remaining State Law Claims.*

 Because all the claims over which the Court had original jurisdiction have now been removed from the case due to the Court's decision to grant defendants' motion for summary judgment with respect to all of the federal claims, § 1367(c)(3) applies.[44] As the Supreme Court has observed,

> [A] federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims. When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.

*Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) (footnote omitted). *See also Hardy v. Birmingham Bd. of Educ.*, 954 F.2d 1546, 1550 (11th Cir.1992). Pursuant to this admonition, and the subsequent enactment of 28 U.S.C. § 1367(c), the dismissal of plaintiff's pendent state-law claims is appropriate.

Plaintiff argues that even if the Court decides to dismiss all of his federal causes

---

44. This section provides that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a)

if the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

of action, dismissal of his pendent state-law claims is inappropriate. Relying on *Edwards v. Okaloosa County,* 5 F.3d 1431 (11th Cir.1993), plaintiff claims that dismissal of his pendent claims would be an abuse of discretion because the state statute of limitations has expired. Plaintiff, however, did not read the Eleventh Circuit's decision in *Edwards* very closely. In *Edwards,* the court noted that the case had been filed before the enactment of the Judicial Improvements Act of 1990, Pub.L. No. 101–650, 104 Stat. 5113. Because of this, 28 U.S.C. § 1367 (Supp. III 1991), which codified supplemental jurisdiction, was not applicable as the statute is not retroactive. *Edwards,* 5 F.3d at 1433. If the statute were applicable, the court stated, "subsection (d) [45] would appear to toll the Florida statute of limitations, preserving Edwards' pendent wrongful death claim." *Id.* at 1433 n. 1. Section 1367(d) is applicable in this case. As such, plaintiff's state law claims are not barred by Georgia's applicable statute of limitations, as the limitation period has been tolled while those claims have been pending before this Court. *See* 28 U.S.C. § 1367(d). Thus, plaintiff's argument is meritless.

The Court concludes that dismissal is appropriate in this case as all federal claims have been dismissed and only state law causes of action remain. "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Thus, plaintiff's state law claims are dismissed.

## IX. *Elaboration on Court's Previous Order*

 In this Court's order granting defendants' Motion In Limine To Strike Expert Testimony [22], the Court stated that it would elaborate upon its ruling when it ruled on defendants' Motion for Summary Judgment. (*See* Order [34] at 1.) The Court now turns to this subject.

Plaintiff identified Mr. Fred G. Robinette III as an expert witness in his mandatory disclosures. Despite consistent prodding from defendants, plaintiff did not submit a written report prepared and signed by Mr. Robinette containing the information required by Federal Rule of Civil Procedure 26(a)(2)(B) until August 13, 1997.[46] Discovery in this case was set to expire on September 8, 1997.

Local Rule 26.3 provides:

Any party who desires to use the testimony of an expert witness shall designate the expert sufficiently early in the discovery period to permit the opposing party the opportunity to depose the expert and, if desired, to name its own expert witness sufficiently in advance of the close of discovery so that a similar discovery deposition of the second expert might also be conducted prior to the close of discovery.

Any party who does not comply with the provisions of the foregoing paragraph shall not be permitted to offer the testimony of the party's expert, unless expressly authorized by court order based upon a showing that the failure to comply was justified.

LR 26.3C, NDGa. Pursuant to this rule, a party who wishes to use expert testimony at trial must identify his expert witness, and make him or her available to be deposed sufficiently early in the discovery period so that the opposing party has

---

**45.** 28 U.S.C. § 1367(d) states:

(d) The period of limitations for any claim asserted under subsection (a) [pendent state law claims] ... shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

**46.** As a retained expert, Mr. Robinette was required to submit an expert report as set out in Federal Rule of Civil Procedure 26(a)(2)(B).

enough time to decide if they need rebuttal expert testimony, retain an expert, compose that expert's expert opinion report, and allow the other party the opportunity to depose that expert *within the discovery period.*

Federal Rule of Civil Procedure 26(b)(4)(A) prohibits a party from deposing an expert witness for whom an expert report is required under Federal Rule of Civil Procedure 26(a)(2)(B) until the report is provided. Thus, defendants in this action could not have possibly deposed Mr. Robinette until August 13, 1997. However, due to the extensiveness of Mr. Robinette's report, to expect defendants to be prepared to depose him without significant preparation time is simply unrealistic. Thus, plaintiff clearly failed to comply with Local Rule 26.3C by not making Mr. Robinette available to be deposed sufficiently early in discovery so that defendants could decide whether they wished to retain a counter-expert, locate and retain a counter-expert, allow that expert to prepare his expert report, and make that expert available for deposition within the discovery period.

Local Rule 26.3C provides that a party who fails to comply with its mandate "shall not be permitted to offer the testimony of the party's expert unless expressly authorized by court order based upon a showing that the failure to comply was justified." LR 26.3C, NDGa. Such an order will not be forthcoming.

Plaintiff argued that he should be permitted to offer Mr. Robinette's expert opinion because he could not afford to pay his retainer earlier. However, correspondence from plaintiff's counsel to defense counsel, in response to defense counsel's request for Mr. Robinette's expert report, leads the Court to conclude that plaintiff's failure to produce Robinette's expert report was done in a willful disregard of the Federal Rules of Civil Procedure and Local Rules for the Northern District of Georgia. In a letter to defense counsel, plaintiff's attorney stated, "*We,* on the other hand, see Rule 26(a)(2)(C) ... as creat-

ing a *directory* situation, the blatant *abuse* of which is punishable, but as more instructive than mandatory." (*See* Defs.' Mot. in Limine to Strike Expert Testimony [22] at Ex. F, pg. 2.) Quite to the contrary, Federal Rule of Civil Procedure 26(a)(2)(C), in conjunction with Local Rule 26.3C and Federal Rule of Civil Procedure 26(b)(4)(A), is clearly mandatory. Mr. Robinette's expert report was due far earlier in the discovery period than it was provided. Such disregard for the procedural rules of this Court will not be tolerated.

Thus, plaintiff's failure to comply with Local Rule 26.3C, and his attorney's cavalier attitude that only blatant violations of the Federal Rules of Civil Procedure would be punished, have led the Court to conclude that Mr. Robbinette's testimony should be excluded from this matter. (*See* Order [34].) Thus, Mr. Robinette's testimony was not considered by the Court in its ruling on defendants' Motion for Summary Judgement.

### *CONCLUSION*

For the foregoing reasons, the Court finds that defendants' Motion for Summary Judgment [26] should be **GRANTED.** The Court **DIRECTS** the clerk of court to close this case, and enter judgment in favor of defendants.